335 So.2d 420 (1976)
Reginald Reese ROBINSON, alias
v.
STATE.
3 Div. 503.
Court of Criminal Appeals of Alabama.
May 18, 1976.
Rehearing Denied June 29, 1976.
*421 George W. Cameron, Montgomery, for appellant.
William J. Baxley, Atty. Gen., and Jack Curtis, Asst. Atty. Gen., for the State.
BOWEN W. SIMMONS, Supernumerary Circuit Judge.
A jury convicted appellant-defendant, an indigent here and at nisi prius, of murder in the first degree for which the court sentenced him to life imprisonment. Lawful judgment was entered. The defendant entered a plea of not guilty.
The victim was Manferd E. Furr who was felled and died immediately from a gun blast which, according to expert evidence, was fired at a distance of five feet or less.
The homicide took place on Dexter Avenue in Montgomery in the morning of October 12, 1974, about 9:30 o'clock, under such circumstances as we will try briefly to relate.
The evidence tends to show that defendant and some other involved black people assembled at the house of Arthur O. Lewis, alias Arthur X., from which point two of them rode in an automobile to Commerce Street (an extension of Dexter Avenue) where they got out and proceeded, armed with a gun, to Dexter Avenue; that Arthur X. and two other involved persons rode in another automobile to a point on Dexter Avenue, fully armed with guns, where they alighted on the south side of the street from which point they proceeded across Dexter Avenue to the north side. There, all five met each other.
One of the five involved parties was Alfonzo Davis, who was also indicted for the murder of Mr. Furr. After being advised of his rights by his attorney, who was present in court, Mr. Davis elected to testify as a witness for the State.
It appears from his testimony, much of which is corroborated by other witnesses not involved, that he moved into Arthur X.'s house on Wednesday night before the shooting on Saturday, October 12, 1974, where the said Arthur X. was teaching Islam religion. Defendant, Reginald Robinson, Julian Davis, Amos Williams and Charles Williams were there, all being taught Islam religion by Arthur X. Lewis. He said Arthur X. taught them that God would come to judge the people and that people would be fighting and dying; that he had people he could contact who would support or fight for him; that he had enemies and they could not be trusted and that he had rather see his enemies dead.
"Q. What if anything did he tell you about who the good people were and who the evil people or the devilwho were the devil's people?
"A. Oh, when he said the devil, he meant mostly white people."
The witness further testified that on Saturday morning, the day of the incident, they had another meeting at which time Arthur X. said they would take up donations downtown and sell tickets; that present were Arthur X. Lewis, Reginald Robinson (defendant), Julian Davis and Amos Williams. Arthur X. told them that they were going to take donations and, "we wasn't going to mess around or play around but if anyone hasseled us about it, we were to fight them," that his instructions about fighting were "to disable someone and to maim them."
The witness further testified that he and Charlie Williams went to town in his car and that defendant, Julian Davis, Arthur Lewis (referred to as Arthur X.) and Amos Williams went in Charlie Williams' car; that he parked on Commerce Street, and the others parked near Belk Hudson's on Dexter Avenue; that he and Charlie Williams walked up Dexter Avenue; that he had his weapons; these were two twelve gauge shotguns. Further, as he was near the Bible Store, he saw Arthur Lewis, defendant and Julian Davis walking "toward *422 us," that "we" stopped and waited on them. No collections were taken up that morning.
The witness testified that he noticed Arthur Lewis was talking loud and saying for no one to say anything to him; he approached an old man standing there drinking wine or something. The man mumbled something; that he saw Arthur Lewis reach across "his back" and draw a machete, held it out in front of the old man who had mumbled and cut him with it. (Other evidence shows that Lewis cut a very severe wound across the "old man's" face.) Then all three, Lewis, defendant and Julian, ran across the street toward their car in front of Belk Hudson's. The witness and Charlie Williams went back to their car, and the witness said he left town.
The witness testified on cross-examination that he had a weapon, but did not know what he was doing with it, "I just had one."
On redirect, he said he did not see Amos Williams when the three ran back across the street. Amos was the sixth man.
It further appears from the evidence, as we read the record, that Mr. Furr, informed of the cutting, left his post of duty as an officer in H. L. Green's store and went across the street toward the automobile of the foursome that was parked there. When he got out there, he was assaulted by Arthur X., one of the three who had gone across Dexter Avenue. Arthur X. was the one who cut the "old man" with the machete and fled. It was there that Mr. Fun was shot at close range by Arthur X. and killed. Defendant got out of the parked car with a gun.
The three, Lewis, defendant and Julian, took off in their parked automobile, but were intercepted by a police car that blocked their path and a collision ensued. Then the three fled the scene on foot and escaped from the police officers.
As we further read the record, they showed up at WAPX Radio Station bearing their arms and took over the station. Present at the time was a secretary and Alfonso Kent Dixon, both of whom were employed at the station. The secretary went to answer the door and came back with Arthur Lewis who had a sawed-off shotgun. He told Dixon if he did not want to die, to get "in there and start talking." He was bleeding. After Lewis had. completed his first broadcast, the defendant "came back toward the back."
The State prosecutor produced Exhibit 10, which was a taped recording of the broadcast by Lewis, defendant and some by the male employee. The broadcast was monitored by the witness-employee and played to the jury. There were interruptions for identifications by the witness as to who was broadcasting. We will not weight this opinion with details of the broadcasts. Suffice it to say that both defendant and Lewis were appealing for the black community to come to their supportin other words, they were trying to rally the black people who were listening to appear on the scene and rally to their support. So far as the record shows, the appeal was futile. The trio finally surrendered to the police, coming out waving "a white flag." They were arrested.
The evidence further shows that shotguns and ammunition therefor were found in the radio station after the surrender. Identifying expert testimony as to the use of the guns during the res gestae was admitted.
The record further shows that there was considerable gunfire between the trio and the police after Mr. Furr was killed, and before the trio escaped in the car; also during their getaway in the car and before the collision; also while they were in WAPX.
We note in one broadcast appeal defendant said:
"Everybody, everybody black on the streets. Ain't no use talking to you niggers. You all ain't never thought nothing like this would happen in Montgomery, Alabama, did you? Yeah? Well, here it is. Right here in you all's capitol. It is going to be ours in a few days, because we are going to stand up and take it, or die trying."
*423 At another replay, defendant broadcast as follows:
"Yeah, they are tying to kill us all right, and don't think we ain't trying to kill them. So, come on and get you one, because I'm going to get mine."
Defendant took the stand and testified as to his conversion to Islam religion under the guidance and teaching of Arthur X. Lewis; that on this Saturday morning, he, Alfonzo Davis, Charlie Williams, Arthur Lewis, Julian Davis ("and the one I don't know anything about") took off for downtown Montgomery to raise money for their religious purposes, donations toward "the school and the hospital that we were trying to build." A gun that belonged to defendant was in the automobile. The witness testified that he was present when Mr. Parham (the old man) was cut. He said, "I didn't see anything." Somebody said run, "and I ran," to that car and got the gun out of the back seat, but he did not fire it; but later he fired it, "when we were in the station." He said he had the gun, bandoliers, fire bomb and the Molotov cocktail for his protection. The witness testified that he did not shoot Officer Furr and did not know who shot him.
The State:
"Q. But you were, from the time you left that house, ready, willing and able with all of these guns and all of this ammunition to help your brothers if they needed it?
"A. Yes, sir."
While we have not included in this opinion a full and complete record of all details, we think it is clear from the evidence that the defendant (appellant), his brothers and his leader, Arthur X., all left for town, with guns, shells and other explosives, looking for trouble. The first act of maiming was leader X. cutting Mr. Parham on his face with the sharp blade of a machete; then two fled, and defendant, with his two brothers proceeded to their automobile, but before leaving in it, one of their number killed Mr. Furr. Further shooting ensued, but no one else was killed or maimed. They accomplished their mission to kill or maim as a starter, but they failed in their radio appeal to start a conflagration of wholesale violencethe black people using good judgment and common sense, refused to respond to the revolutionary invitation. After the appeal failed, then the white flag was hoisted and defendant and his "brothers" were all jailed.
While it does not appear that appellant-defendant was one of the trio who actually fired the shot that killed Mr. Furr, sufficient evidence was adduced from which the jury drew a reasonable inference that he was an accomplice and equally guilty as a principal with the one who fired the fatal shot. Title 14, § 14, Recompiled Code 1958; Lee v. State, 51 Ala.App. 332,285 So.2d 495, cert. denied 291 Ala. 787, 285 So.2d 500.
The jury could reasonably infer that defendant, along with the others, including their leader Arthur X., set out on a mission of wholesale violence and accomplished their objective to a limited extent, namely, the slashing of one person with a machete and the death of another. The good judgment of other black people not to respond to the radio appeal prevented more violence. We might state parenthetically that the good sense of the black people not to respond to such an appeal for violence is very commendable.
We are constrained to hold that appellant's assertion that the trial judge committed prejudicial error in charging the jury, in response to the latter's inquiry after deliberations had begun, as to the operation of the Pardon and Parole Board of Alabama.
We quote from the record as follows:
"THE COURT: I understand that you have a question to pose. Are you the foreman?
"THE FOREMAN: Yes, sir.
"THE COURT: All right. State the question.
"THE FOREMAN: There seems to be some misunderstanding among the jury.

*424 There is a part of the law we want to get clarified after we reach our verdict.
"In the first instance, if we the jury find the defendant guilty of murder in the first degree, we understand that his punishment is fixed at life. All right. If that is the case, is the defendant eligible for parole after any number of years?
"THE COURT: I will answer your question in this way: The jury's decision concerns itself with the application of law to the facts, and the application only of the law that the Court has charged you concerning, and the Court has in no way charged you concerning the law of the State of Alabama as it pertains to a convict receiving or not receiving parole. So, it should not have any effect or weight upon your consideration.
"Now, I will give it to you by way of information only. There is in the State of Alabama a board of pardons and paroles. It consists of three people. They are appointed for staggered terms of six years duration. They are full time employees of the State of Alabama. The laws grant to the parole board absolute authority to parole any prisoner who is an inmate in any state penal institution, or to parole any inmate who is serving time in the county jail. They have the right to parole a person the moment that they enter prison. They have that authority to parole the very moment a person enters prison. They have certain rules and regulations, and their experience has been that people who receive life sentences are given parole consideration at the exploration of ten years and if two of the three members of the parole board vote in favor of granting a parole to a person who, under a life sentence, has served ten years that person is paroled and placed out of the penitentiary under the supervision of a parole officer.
"But I charge you once again: The questions involving parole and the policies and practices of the parole board of the State of Alabama should not in any way be considered by you. But I do answer your question in that capacity.
"Does that answer your question, sir?
"THE FOREMAN: Yes, sir, I think so. Do any jurors have a question?
"THE COURT: All right. State?
"MR. THOMAS: Satisfied, Your Honor.
"THE COURT: Defense?
"MR. CAMERON: Judge, the defense would take exception to that part of the Court's charge where the Court instructed the jury as a matter of information that there was a pardon and parole board inside the State of Alabama and that they did have authority to parole and that they had authority to parole instantly and after a period of so many years. All though (sic) the Court did instruct the jury not to consider it, we feel that the Courtmade an error by even instructing them as a matter of information as to the existence of a pardon and parole board and what their functions were.
"THE COURT: Well, the Court would only observe to that that it would be highly unlikely that these twelve jurors, or any citizens, would not be conscious of the existence of a parole board.
"Did you wish to have them further illuminated into any of those aspects of parole board operations?
"MR. CAMERON: Well, actually, we feel like, Your Honor, that the damage has been done in that the jury, if they had known, would not have asked the Court and that the Court has charged this juryas it did a moment agothat there is a pardon and parole board and that they did have certain authority. And, of course, our position would be that that would be error and eitherjust ask the Court to either declare a mistrial or either give us an erroran exception to the record.
"THE COURT: Your motion for a mistrial is hereby denied. I believe the Court has admonished, caution (sic) and counseled the jury that this does not in any way have any effect upon their deliberations. They should deliberate in such fashion as if there was no such thing as a parole.

*425 "All right. Now, you can retire and resume your deliberations."
It is our opinion that the pronouncements of the Supreme Court of Alabama in Lawley v. State, 264 Ala. 283, 87 So.2d 433, a case wherein similar instructions as to the operation of the Pardon and Parole Board were given, are dispositive of the instant charge. We quoted from Lawley as follows:
"In the present case, it is reasonable to assume that the jury wished to punish the defendant by having him serve a certain number of years in the penitentiary, and in order to insure that he serve that length of time, the jury was planning to add to the length of the sentence in order to compensate for a parole before the entire sentence was served. In Coward v. Commonwealth, 164 Va. 639,178 S.E. 797, which is quoted in McCray v. State [261 Ala. 275,74 So.2d 491], supra, the court said that when confronted with an inquiry such as the one in this case, the trial judge should instruct the jury to impose such sentence as seemed to be just, with no regard to what might happen to the sentence in the future. The trial court in the instant case gave the damaging information to the jury; It is true that when objection was made to his remarks, he told the jury not to consider what he had said, and stated that he withdrew the remarks. We are of the opinion that the attempted remedial action was not sufficient. The information could not be eradicated from the minds of the jury. We cannot say that they considered it in arriving at their verdict, but they might have done so."
This Court is bound by Lawley.
We are constrained to reverse and remand this cause. We are not unmindful of an observation of the Supreme Court of Alabama in Watts v. State, 282 Ala. 245, 210 So.2d 805, as follows:
"The worst wretch that walks the earth is entitled to a fair trial, for the law is superior to all persons. As much as we may regret some results of the law, the law must be preserved if this constitutional democracy is to survive."
The judgment is reversed and the cause remanded for a new trial.
The foregoing opinion was prepared by the Honorable BOWEN W. SIMMONS, Supernumerary Circuit Judge, serving as a judge of this Court under § 2 of Act No. 288, July 7,1945, as amended; his opinion is hereby adopted as that of the Court.

REVERSED AND REMANDED.

All the Judges concur.
DeCARLO, J., concurs specially.
DeCARLO, Judge (concurring).
It is hard to believe that any experienced trial judge in Alabama would discuss the possibility of an accused's parole with the jury trying his case.
This is especially true in light of the long-standing authority condemning such action and proclaiming that such wrong is ineradicable.
It is said indeed when an appellate court is placed in the position of reversing such a serious case for this kind of an infraction. Even more distressing is the fact that the people of Alabama are given the burden of paying for a second trial.
The distinguished trial judge, by his action, has given us no other choice. The law, long settled by the Supreme Court of Alabama, must be followed.