461 So.2d 834 (1983)
Danny Ray WILLIAMS
v.
STATE.
6 Div. 761.
Court of Criminal Appeals of Alabama.
May 31, 1983.
Rehearing Denied July 5, 1983.
*836 Orson L. Johnson, Birmingham, for appellant.
*837 Charles A. Graddick, Atty. Gen., and Edward Carnes and William D. Little, Asst. Attys. Gen., for appellee.
BOWEN, Presiding Judge.
On March 21, 1981, the defendant, after months of stalking James A. Taylor pursuant to a contract for hire, shot Taylor with a sawed-off shotgun at point blank range. He was indicted for the capital offense of "(m)urder in the first degree when the killing was done for a pecuniary or other valuable consideration or pursuant to a contract or for hire." Alabama Code Section 13A-5-31(a)(7) (1975). At the guilt-finding phase of his trial, a jury found the defendant "guilty of the capital offense as charged in Count One of the indictment." At the sentence-determining phase, the jury fixed the defendant's punishment at death. The trial judge then held the hearing mandated by Sections 13A-5-32 and -33, accepted the death penalty as fixed by the jury, and sentenced the defendant to death.
The trial and sentencing proceedings were conducted in accordance with Beck v. State, 396 So.2d 645 (Ala.1981), following the decision of the United States Supreme Court in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). Nine issues are presented on appeal.
The facts of this case were succinctly recounted by the trial judge in his findings of fact required by Section 13A-5-33:
"On March 21, 1981, the defendant, Danny Ray Williams, and Walter `Red' Hunt, after months of stalking the victim, James A. Taylor, pursuant to a contract for hire completed their task. The defendant shot Mr. Taylor with a sawed-off shotgun at point blank range from the passenger side of his automobile into the vehicle of Mr. Taylor while Mr. Taylor was driving along Interstate 59. The consideration for this task was $1,500.00 which was promptly paid."

THE GUILT-FINDING PHASE

I
The defendant's motion for a change of venue, which was only supported by "clippings from local newspapers", was properly denied. Newspaper articles giving publicity to the crime charged are not alone sufficient to show prejudice warranting or requiring a change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala. Cr.App.1978); 22 C.J.S. Criminal Law Section 196(2) (1961). "(A)s a general proposition, routine pretrial publicity disseminated in a criminal case does not per se afford a sufficient basis upon which to grant a defendant's motion for change of venue." Annot., 33 A.L.R.3d 17, 39-40 (1970). "(T)he existence of widespread publicity alone does not entitle a defendant to a change of venue." Dolvin v. State, 391 So.2d 666, 674 (Ala.Cr.App.1979), affirmed, 391 So.2d 677 (Ala.1980). Here, there was no showing that the publicity either prejudiced any individual juror or caused pervasive hostility within the community. Murphy v. Florida, 421 U.S. 794, 802-03, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975). For these reasons, the motion was properly denied.

II
The defendant's amended motion to quash the indictment was properly denied. "The judicial reconstruction accomplished in Beck (396 So.2d 645) was procedural and therefore constitutional", and did not violate the separation of powers doctrine. Clisby v. State, 456 So.2d 95 (Ala.1983); Potts v. State, 426 So.2d 886 (Ala.Cr.App. 1982), affirmed, Ex parte Potts, 426 So.2d 896 (Ala.1983).

III
The defendant's amended demurrer to the indictment was properly denied.
The indictment charged "murder in the first degree when the killing was done for pecuniary or other valuable consideration." Section 13A-5-31(a)(7) (emphasis added). This section is a part of Alabama's new criminal code. The criminal code became effective January 1, 1980. The crime was committed in March of 1981.
*838 The criminal code repealed Section 13-1-70 of the 1975 Alabama Code defining the degrees of murder. Under the criminal code the degrees of murder are abolished and homicide is divided into murder, manslaughter and criminally negligent homicide. Sections 13A-6-2, -3, -4. However, the capital offense defined in Section 13A-5-31(a)(7) retains the crime of murder in the first degree as a component of that capital offense despite the fact that there is no crime of murder in the first degree defined by the criminal code.
Potts, supra, makes it clear that a 1975 code offense definition can exist as a component of a capital offense even after that particular code section has been repealed or superseded by a provision in the new criminal code.

IV
When the record is silent on whether or not the trial judge ascertained the qualifications of the jurors as required by Sections 12-16-6 and -60, this Court presumes the trial judge did his duty and did it correctly. Washington v. State, 81 Ala. 35, 38, 1 So. 18 (1887). The silence of the record raises no presumption of error. Washington; Durden v. State, 394 So.2d 967, 977 (Ala.Cr.App.1980), cert. quashed, 394 So.2d 977 (Ala.1981). Additionally, the judgment entry reflects that the jury "was duly empaneled and sworn according to law."

V
The defendant argues that his extra-judicial confession was involuntary and in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Essentially, he contends that the actions of the law enforcement officers led him to believe it would be in his best interest to cooperate and give a statement and that their conduct and words generated the hope that his case would be "lightened" if he cooperated.
The standards for appellate review of a trial judge's determination of the admissibility of a confession are as follows: (1) The test for voluntariness involves a consideration of the totality of the circumstances. Haynes v. Washington, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1342-43, 10 L.Ed.2d 513 (1963). (2) "The admissibility of confessions is for the court, their credibility is for the jury." Phillips v. State, 248 Ala. 510, 520, 28 So.2d 542 (1946). (3) Where the voluntariness inquiry presents conflicting evidence and the trial judge finds that the confession was voluntarily made, great weight must be given his judgment. "(W)here there is a genuine conflict of evidence great reliance must be placed upon the finder of fact." Blackburn v. Alabama, 361 U.S. 199, 208, 80 S.Ct. 274, 281, 4 L.Ed.2d 242 (1960). (4) This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the great weight of the evidence and manifestly wrong. Harris v. State, 280 Ala. 468, 470-71, 195 So.2d 521 (1967). (5) Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial court need only be supported by substantial evidence and not to a moral certainty. Thompson v. State, 347 So.2d 1371, 1375 (Ala.Cr.App.), cert. denied, 347 So.2d 1377 (Ala.1977) and cases cited therein. "Review of the court's action is limited to determining whether its finding was clearly erroneous." United States v. Greer, 566 F.2d 472, 473 (5th Cir.1978). Applying these principles, we have reviewed the testimony adduced both on the motion to suppress and at trial, and find that the defendant's confession was voluntary and in compliance with constitutional standards.
The murder occurred on March 21, 1981. The defendant was arrested at his residence at approximately 6:00 on the evening of March 22nd. He voluntarily signed a written waiver of his Miranda rights and a written consent to search his automobile before he was taken to the Birmingham office of the Alabama Bureau of Investigation. ABI investigator Marvin Roy testified *839 that the defendant was nervous but appeared "alert, aware, cooperative" although the defendant later told the officers that he had "taken drugs". The defendant was not questioned on the way to ABI headquarters.
At the ABI office, the defendant was again advised of and waived his Miranda rights. He gave a handwritten statement which he signed at 7:37 that night. At 7:46 p.m. the defendant was warned of and waived his Miranda rights a third time and gave a taped statement which lasted until 7:55 p.m. The defendant was not further interrogated that night. At trial, neither the defendant's handwritten nor his taped statement taken on March 22nd was introduced into evidence.
Before the defendant gave any statement, Investigator Roy told him that they "knew what had happened and he needed to get it off his chest." The defendant was shown the shotgun used in the murder. Roy told the defendant that they knew that other people were involved and "possibly" mentioned one of them by name. The defendant was also told that the officers "had other information which indicated his involvement and the fact that he ... actually pulled the trigger."
Investigator Roy testified that they confronted the defendant with the evidence against him and "led him to believe, ... that it was in his best interest that we go ahead and get the facts, as far as his actual involvement, because we knew he didn't act alone." Roy also testified that he "never made any specific statement that it would be better for (the defendant) to go ahead and tell ... about this." Roy stated, "I didn't try to coerce him, as far as making any promises or any promise of any kind of thing on his part, to coerce the statement."
Roy tried to appeal to the defendant's "sympathy" by explaining that "this was a very serious matter and something that needed to be brought out if there were others involved and, certainly, he didn't need to take it by himself." After Roy indicated that he did not offer the defendant "any hope of reward or tell him it would be better or worse for him if he did not make the taped statement", the trial judge remarked:
"He has said that no one told him it would be better or worse for him if he made a statement, and awhile ago, he said he was told it would be in his best interest if he made the statement. Those two statements conflict, as far as I'm concerned."
In explanation, Roy testified that "we felt and, of course, I think he felt, tooit would be better for everybody concerned" with the defendant "cooperating and talking to us and giving us a statement or whatever."
Investigator Roy told the defendant that his cooperation would be made known to the district attorney. Roy did not threaten or tell the defendant that he would face the electric chair if he did not give a statement.
The defendant remained at ABI headquarters until approximately 1:00 a.m. March 23rd. At that time ABI Investigator Leon Hampton transported the defendant to the Trussville City Jail where he remained for his own protection and at his own request until he was moved to the Jefferson County Jail on April 16th.
When being transported to the city jail, the defendant said to Hampton "words to the effect that he was sorry for what he did." That statement was not introduced at trial. The defendant asked Hampton either what "they mean by capital murder" or "what is capital murder." In response to the defendant's inquiry, Hampton explained that capital murder meant that the defendant could get the death penalty. This was the only conversation Hampton and the defendant had "concerning this case at all."
Hampton testified that the defendant was "real upset over the possibility of getting a death sentence" and was "very emotional" although he was not crying and did not appear to be on drugs. Hampton stated that the defendant initiated the conversation about the death penalty and was "pretty shook up before" he explained the *840 meaning of capital murder. At trial, Hampton testified that he had "the impression" that the defendant had been informed and knew something about capital murder that night because "he asked the question."
Sergeant Don Emerson of the Trussville Police Department was the officer in charge of the Taylor homicide investigation. He was present when the defendant was arrested. He and Investigator Roy interrogated the defendant at ABI headquarters the night of the defendant's arrest.
While the defendant was in the Trussville City Jail, Sergeant Emerson "checked with him daily to see if he was okay, that he hadn't harmed himself, and offered him an opportunity to use the phone." The only promise Emerson made to the defendant was that he would be protected from "Red" Hunt, an accomplice. For his protection in the city jail, the defendant was kept in a cell by himself in the women's section of the jail which was separated from the men's.
On April 2nd, Emerson obtained a warrant charging the defendant with murder. The defendant asked "the specifics of the charge" and Emerson told him "the only thing (he) knew about the charge was (he) had been told it didn't carry the death penalty." Emerson stated, "I informed Mr. Williams that I had obtained a warrant for him at the county courthouse and the charge that he was charged with at that time did not carry the death penalty." The defendant asked Emerson "if the charge carried that." Emerson never promised the defendant that he would not be charged with capital murder and never told him that he faced the death penalty.
On April 4, 1981, while the defendant was still confined in the city jail, the defendant "initiated" and approached Emerson "with the idea of giving ... a statement." Emerson testified:
"He asked me what he had been charged with, and he asked me how the investigation was going, whether we had arrested any additional people. I informed him that (the) investigation was continuing and we were still gathering information. He said, `Well, I'll be glad to help you in any way I can.' I said, `Well, I can take a statement from you if you're willing to give me a statement.' And he said, `Yes.' He said, `I'll give you a statement and any information I have in order to help in the investigation.'"
....
"Mr. Williams told measked me how the investigation was going, and I told him we were still working on it. And he said if there washe asked if there was any way he could help, and I said we are still gathering information. He said I'll tell you everything I know. I said we'll have to take a statement from you. And that's when he made the taped statement...."
At 10:48 a.m., April 4th, the defendant was advised of his Miranda rights for the fourth time since his arrest. The defendant signed a written waiver and gave a tape recorded statement. The taped interview concluded at 11:33 a.m. This statement was transcribed and the defendant signed it on April 9th. This was the only confession introduced at trial.
Sometime after this and "shortly before" the defendant was transferred to the county jail on April 16th, he asked Sergeant Emerson "what the procedure would be from that point on." This conversation was the first and only time the defendant and Emerson discussed a lawyer. This conversation occurred after the April 4th confession. Emerson testified that he made a mistake at the preliminary hearing when he testified that the defendant asked about an attorney before his April the 4th statement.
Emerson testified:
"I informed him that he would be transferred to the county jail and that if he couldn't afford an attorney, one would be appointed for him; that the procedure would consist of a preliminary hearing and the Grand Jury and the trial. He stated then, to me at that time, that he wouldn't need a trial, he intended to go *841 ahead and plead guilty. In fact, he said to me he wouldn't even need a lawyer. He said he was pleading guilty to the charge."
The defendant said that he "didn't have any money for a lawyer" and that "his family didn't have any money for a lawyer." Emerson told the defendant that "eventually the Court would appoint one (lawyer) if he didn't have the money" and "that would be handled through the Court." During this conversation the defendant "only made reference to the fact that he didn't have any money and would the court appoint him an attorney. He mentioned that a couple of times. That was the only way it came up." The defendant was asking "what the procedure was from that point on, once he got to the county jail"; "what the procedure would be; ... the step by step, through the judicial system."
The defendant did not testify at trial. At the pretrial hearing on the motion to suppress his confession, he stated that Sergeant Emerson and Investigator Roy told him: "If you will make a statement about what happened and let us know who else was involved, we will make sure you don't get sent to the electric chair; we will make sure you get all the breaks possible." The defendant also stated that they told him that "the more I could help them, ... the more breaks I could get, and they would talk to the people about it and make sure I get as little sentence as possible."
The defendant further stated that he requested and was denied counsel before giving his first statement on the night of his arrest. He testified that he asked about a lawyer "everyday", wanting to know when he was going to get the lawyer that Emerson had promised but Emerson "kept putting it off and wouldn't answer the question." According to the defendant, Emerson said that he did not need a lawyer "because the judge was a lawyer."
At trial, the defendant's stepfather, James Wesley Parvin, testified that Sergeant Emerson told him that "he would do everything he could to see that Danny got the lightest possible treatment." Parvin stated that Emerson told him that "Danny had been real cooperative with them and Danny was not going to be charged with a capital charge and that he (Emerson) was going to work with the D.A. to see that he gets the lightest sentence that he can. He (Emerson) said he worked with Danny real good every day and went in and out and checked on him off and on every day, and he said Danny was a good boy and just got mixed up with the wrong people."
Eleanor Parvin, the defendant's mother, testified that after she learned of her son's arrest she had trouble finding where he was being held. She confirmed her husband's testimony that Emerson told them that "he would talk to the District Attorney and try to get Danny the lightest sentence he could" and that "as long as Danny talks, we won't give him a hard sentence."
We have set forth the facts in greater detail than is strictly necessary to show that the determination of the admissibility of the confession is fundamentally a question of the credibility of witnesses giving conflicting testimony. As we have previously stated, this question was one for the trial judge.
Although the defendant was promised protection before the April 4th confession, the State's evidence shows that this promise was not given or extracted in exchange for any confession or statement. See Bennett v. State, 409 So.2d 936 (Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137, 102 S.Ct. 2968, 73 L.Ed.2d 1356 (1982); Eakes v. State, 387 So.2d 855, 860 (Ala.Cr.App.1978).
A promise to bring an accused's cooperation to the prosecutor's attention, Bennett, supra, or the disclosure of incriminating evidence to the accused, United States, ex rel. Gorham v. Franzen, 675 F.2d 932, 938 (7th Cir.1982); Moore v. State, 415 So.2d 1210, 1214 (Ala.Cr.App. 1982), does not necessarily render a subsequent confession involuntary.
The State's evidence shows that the defendant was never threatened with the death penalty or told that his cooperation *842 would earn him a lighter sentence and save him from the electric chair. The defendant was neither threatened with dire consequences if he failed to cooperate nor promised leniency if he did.
There was testimony that the defendant was "led to believe that it was in his best interest to go ahead and get the facts." However, this statement, in context and under the circumstances, did not render the statement involuntary. The true test of determining whether extrajudicial confessions are voluntary is whether the defendant's will was overborne at the time he confessed and therefore not the product of a rational intellect and a free will. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).
We view the encouragement to get the facts merely as an exhortation that it is better to tell the truth.
"A promise or inducement for a confession cannot be implied from an exhortation to a prisoner that it is best or better to tell the truth. The rule is otherwise, where the party has been told by a person in authority that it is better for him to confess, or that he will be bettered by saying a particular thing. Edwardson v. State, 255 Ala. 246, 251, 51 So.2d 233 (1951). Here the appellant was only told that it would `be better to make a statement.' This was not tantamount to an urging to confess or to admit guilt. We consider this more consistent with a mere adjuration to tell the truth." Eakes, 387 So.2d at 859-60.
See also Bennett, 409 So.2d at 939-40, wherein a confession was ruled voluntary where the accused was told that "the best thing to do if he was involved was to tell the truth" and that his cooperation would be made known to the District Attorney.
Our independent review of the evidence supports the trial judge's determination of voluntariness. The evidence, although conflicting, furnishes ample support for a finding that methods and tactics used in questioning the defendant were neither unfair nor coercive. Since the ruling of the trial judge is supported by substantial evidence, his finding of voluntariness must be upheld.

VI
Prior to trial, the defendant filed a "motion to restrict press filming of the jury." After all the evidence had been presented and immediately before the judge charged the jury, the following occurred:
"MR. JOHNSON (Defense Counsel): There's one thing I feel I need to put on the record. After we broke for lunch, it came to my attention that a television camera had appeared to film through one of the courtroom windows and appeared to be filming the jury. I filed a motion to restrict that. And it has also come to my attention that Mrs. Johns on the jury informed one of your bailiffs, Mr. Joe Newton, that she saw it and she made a complaint about it.
"THE COURT: I am aware of that.
"MR. JOHNSON: I would request that the Court question and poll the jury as to whether or not this had any influence on them and can they disregard it.
"THE COURT: Of course, I was totally unaware. I have standing instructions with the t.v. people not to film the jury. I was totally unaware. I can't see out there. I was totally unaware of them filming the jury.
"I have talked now with the news director and he assures me that the jury will not be photographed and it will be edited out, that the film will be edited. Of course, I don't run the television station.
"MR. JOHNSON: My request, Judge, is that the jury be polled as to whether they can disregard that fact. They are aware that they have been filmed. It was improper and it wasn't the Court's fault and it wasn't your bailiff's fault, but it happened and the jury is aware of it, and there has been a complaint from the jury room. I would request they be polled.

*843 "THE COURT: Do you want me to tell them what I have just told you?
"MR. JOHNSON: Yes, sir. I'm afraid of it.
"THE COURT: Any objection?
"MR. NAIL (Deputy District Attorney): No, sir.
"THE COURT: I will do that. I won't poll them individually. I will ask if anybody on the jury, if that would affect their decision."
In his instructions, the trial judge inquired:
"Possibly a television camera has focused on this jury. It is a standing instruction of this Court that that not happen. I am aware that it did happen. That won't happen again. After a discussion with the t.v. people that you people are not public figures. I am, the lawyers are, but you are not. Anything, any pictures of you, will be edited out. That is the understanding I have, and I am sorry that it happened and it should not affect your verdict in any way whatsoever, and I am sure that it will not. But if it does affect anyone's judgment, that fact that it has already happened will affect anyone's verdict in this case, either in this phase or any other possible phase, let it be known.
"I take it from everyone's silence that that fact would not affect your judgment in this case. Of course, the issue is the law and the facts of this case as it pertains to this Defendant, and I am sorry that it did in fact happen."
In this state of the record and without some showing of prejudice, we find nothing upon which to base a finding of error. Even telecasts of state criminal trials do not violate the due process clause of the Fifth Amendment. There is no per se rule that prohibits television cameras from state courtrooms. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981).

VII
The defendant alleges that his case is due to be reversed because of the improper arguments of the prosecutors during their summations to the jury.

A
In arguing that the defendant was not induced or coerced into making a confession, the Deputy District Attorney stated:
"There is a lot of things said about the statement from the stand. If you want to feel sorry for the fact that maybe Danny Ray Williams was fooled into telling the police about it, about his part in this thing, it might be one thing, it might be one thing if Danny Ray Williams had been coerced or somehow forced into making a statement about a crime he didn't commit; that might be one thing. But there's no testimony that he was coerced into making a statement about something he didn't do. You think about that. That's very important, when you think about that. There's no evidence presented on the stand that Danny Ray Williams made a statement for something he didn't do."
There was no objection to this portion of the prosecutor's argument. Yet, even if there had been, we do not consider this a comment on the defendant's failure to testify.
The rule is that a statement by a prosecuting attorney to the effect that the evidence for the state is uncontradicted or undenied is not a comment on the defendant's failure to testify unless the defendant himself is the only one who can contradict or deny the evidence. Diamond v. State, 363 So.2d 109, 113 (Ala.Cr.App.1978); Robinson v. State, 352 So.2d 11, 13 (Ala.Cr. App.), cert. denied, 352 So.2d 15 (Ala.1977); Annot., 14 A.L.R.3d 723 (1967).
This rule was not violated because the record reflects that there were three people present when the defendant gave his confession on April 4th: Sergeant Don Emerson, the defendant, and Jo Ellen Townsend. Townsend did not testify. This is not a case where the defendant was the only one who could refute the prosecutor's statement. Vickery v. State, 408 So.2d 182, 186 (Ala.Cr.App.1981); Qualls v. *844 State, 371 So.2d 949 (Ala.Cr.App.), cert. denied, 371 So.2d 951 (Ala.1979).
We distinguish this case from Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975), wherein our supreme court condemned a prosecutor's comment that "no one took the stand to deny" the testimony of the deputy sheriff who was the sole witness to an extrajudicial self-inculpatory admission by the defendant.
Here, the prosecutor was not asking who could deny what was said in the conversation. The thrust of the comment went to the state of the evidence and the strength of the State's case, for in fact there was absolutely no evidence that the defendant did not commit the crime. Likewise, there was no evidence that the defendant "made a statement for something he didn't do."
This case is unusual in that the defendant's own evidence indicated his guilt. Kim McCain testified as a defense witness that "Red" Hunt hired him to kill Taylor before he introduced the defendant to Hunt. On cross examination, McCain gave some of the most damaging testimony presented against the defendant. He stated that the defendant told him how they committed the murder and, after the killing, admitted his participation.
In his defense at trial, the defendant attempted to discredit his confession by presenting testimony that it had been coerced and made in exchange for a lighter sentence. The defendant's parents testified that Sergeant Emerson told them that as long as the defendant cooperated he would see that the defendant got the lightest possible sentence. The defendant also called State's witnesses Emerson and Hampton in an attempt to discredit their former testimony as to the voluntariness of the confession.
Thus, the prosecutor's argument is an apparent attempt to defend the officers' testimony where the defense had chosen to attempt to impeach their credibility without offering testimony to contradict the evidence of the defendant's guilt. United States v. Adamo, 534 F.2d 31, 40 (3rd Cir.), cert. denied, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976); Robbins v. United States, 476 F.2d 26, 29 (10th Cir.1973).
While prosecutors should avoid jeopardizing otherwise certain convictions by arguments that border on forbidden ground, United States v. Sanders, 547 F.2d 1037, 1042 (8th Cir.1976); United States v. Williams, 479 F.2d 1138, 1141 (4th Cir.), cert. denied, 414 U.S. 1025, 94 S.Ct. 452, 38 L.Ed.2d 317 (1973), the Deputy District Attorney did not travel into the ground of reversible error in this case. Even Beecher recognizes the prosecutor's right to point out to the jury the fact that the State's evidence stands uncontradicted. 294 Ala. at 682, 320 So.2d 727.

B
The defendant also finds objectionable the following comment of the prosecutor made in final summation:
"Look at that evidence when you get back there in that jury room, and you decide whether Danny Ray Williams was telling you the truth. Mr. Johnson (defense counsel) won't get up here and tell you he wasn't telling the truth. He got up here and asked you to find him guilty of murder, so he can get out on the street in eight years.
"MR. JOHNSON: Judge, I'm going to object. That's improper argument.
"THE COURT: Yes. That is improper argument. The jury is not to consider that at all.
"MR. JOHNSON: We request that they be polled as to whether or not they can disregard that.
"THE COURT: Go ahead.
"MR. JOHNSON: Are you overruling that request?
"THE COURT: Yes, sir."
Initially, we note that the trial judge sustained the defendant's objection and instructed the jury to disregard. In most cases, the evil effect of improper argument is eradicated by the action of the trial judge in sustaining the objection and instructing the jury to disregard. Lee v. *845 State, 265 Ala. 623, 629, 93 So.2d 757 (1957).
Additionally, the first part of this argument must be viewed in light of the closing argument of defense counsel who argued that the defendant "told them anything they wanted him to" because he "was scared and promised protection." Defense counsel also argued "that's a bad statement. It's bad." The prosecutor's argument was merely a reply in kind. Gipson v. State, 375 So.2d 504 (Ala.Cr.App.), affirmed, 375 So.2d 514 (Ala.1978).
The prosecutor's comment that the defendant "can get out on the street in eight years" must also be regarded as a reply in kind and as an answer to the preceding argument of defense counsel. Bell v. State, 227 Ala. 254, 149 So. 687 (1933). Defense counsel argued that the defendant would be sentenced to life imprisonment if found guilty of murder.
"I will appeal to your sense of justice. If you convict him of murder, I guarantee you the judge won't give him ten (years) when he can give him life."
....
"There's no excuse for Danny Williams. I'm not asking you to excuse him. I'm asking you to find him guilty of murder. I guarantee you Judge Crowder will give him life and he'll be down there a long time."
The rule is that it is improper for a prosecutor to argue to a jury that the accused if convicted and sentenced to the penitentiary may be eligible for pardon or parole. Eaton v. State, 278 Ala. 224, 227, 177 So.2d 444 (1965). "However, ... if that argument is in reply to argument by the defense that the defendant, if convicted, will be sentenced to the penitentiary, the rule ... does not apply and the district attorney is within his rights in making his reply to a subject first introduced in argument from the defendant." Grady v. State, 391 So.2d 1095, 1099 (Ala.Cr.App. 1980), quoting Matthews v. State, 54 Ala. App. 359, 362, 308 So.2d 718 (1975), and cases cited therein.

C
The defendant also complains of the following comment by the assistant district attorney:
"MR. NAIL: ... You look at that evidence when you get back there and you determine if Danny Ray Williams is telling the truth. The same story he told Marvin Roy the night he was arrested, to Don Emerson three or four days later. He told everybody out there he knows. And it's the same story, ladies and gentlemen.
"MR. JOHNSON: I object to that as being improper argument.
"THE COURT: Overruled.
"MR. JOHNSON: There is no testimony as to what story he did tell Marvin Roy the night he was arrested.
"THE COURT: Go ahead."
The defendant argues that this constitutes reversible error since there was no evidence presented at trial as to what, if anything, the defendant told Marvin Roy.
Although the statement the defendant gave to Sergeant Emerson on April 4th was the only statement introduced into evidence at trial, our review of the record shows that there was evidence that the defendant had given several incriminating statements and testimony that supports the prosecutor's argument.
At trial, Investigator Roy testified as a State witness. On cross examination, he stated that he, along with other officers, arrested the defendant, took him back to ABI headquarters and questioned him. He testified that the defendant cooperated and gave a statement.
On cross examination of Investigator Emerson, defense counsel injected the fact that Emerson had tape recorded the defendant's statement three days before April 4th and that Emerson testified at the preliminary hearing that the second statement was taken "to see if there was any details or any information, any information that Mr. Williams might have overlooked in his first statement that would aid in the investigation."
*846 In testifying as a defense witness, Leon Hampton stated on cross examination that he was aware that the defendant "had given a statement to other officers that night (of his arrest)."
This testimony furnishes a reasonable inference that the April 1st statement was incriminating and similar to the statement given on April 4th, only less detailed. "The prosecutor, as does defense counsel, has a right to present his impressions from the evidence.... He may argue every matter of legitimate inference and may examine, collate, shift and treat the evidence in his own way." McQueen v. State, 355 So.2d 407, 411 (Ala.Cr.App.1978). "(C)ounsel are allowed considerable latitude in drawing their deductions from the evidence in argument to the jury." Espey v. State, 270 Ala. 669, 674, 120 So.2d 904 (1960); Roberts v. State, 346 So.2d 473 (Ala.Cr.App.), cert. denied, 346 So.2d 478 (Ala.1977).
With reference to the prosecutor's comment that the defendant "told everybody out there he knows", there was evidence that the defendant told Christy Ann Kelly and John Pennington of his plans to kill Taylor and told those two individuals and Kim McCain that he had killed Taylor. Consequently, this portion of the argument is also supported by the evidence.
The prosecutor's request for the jury to determine if the defendant is "telling the truth" must be considered merely as a reply to defense counsel's argument that the confession was coerced.
Viewing the prosecutor's comments in their context, in light of what had transpired, including the preceding argument of defense counsel, and considering the evidence presented at trial and the reasonable inferences to be drawn therefrom, we find no ground for reversible error predicated on these remarks.

THE SENTENCE-DETERMINING PHASE

VIII
The trial judge refused defendant's requested charge which defined life imprisonment without parole.
"DEFENDANT'S REQUESTED CHARGE NO. 6-A
"Ladies and Gentlemen of the jury, I charge you that the highest court of the land, the United States Supreme Court, has found capital punishment to be legal in the United States. Thus, in your deliberation on the question of punishment, you are to presume that if you sentence Danny Ray Williams to death, he will be electrocuted until dead. On the other hand, you are to presume that if you sentence Danny Ray Williams to life imprisonment without parole he will spend the rest of his life in prison. You are to make no other presumptions."
At the sentencing hearing, the record reflects that the following occurred in the judge's chambers, outside the presence of the jury:
"MR. JOHNSON: The jury had a question that was written.
"THE COURT: We can put it after the verdict. The question was is there any exceptions to life without parole under the present law. I refuse to answer the question. I wrote back that the law does not permit me to answer such a question. I don't know myself. I don't know what life without parole means.
"MR. JOHNSON: I submitted a written requested charge, requesting the Court to instruct the jury that life without parole means just that, and I would request that you instruct the jury ...
"THE COURT: It doesn't (sic) mean life without parole, but it doesn't mean life without pardon? It just means the Parole Board can't. It doesn't mean necessarily, the person will die in the penitentiary. I don't think it does. Besides that, the jury doesn't have any business delving into that. That's not part of their function.
"MR. JOHNSON: We except."

A
The requested charge defining life imprisonment without parole was properly *847 refused because it is factually and legally erroneous.
It is erroneous as a factual matter because it is simply not a fact that a death sentence always results in execution. The Attorney General quotes Justice Rehnquist, who has recognized that "(a)lthough capital punishment statutes do not violate the Constitution ... the existence of the death penalty in this country is virtually an illusion." Coleman v. Balkcom, 451 U.S. 949, 957-58, 101 S.Ct. 2031, 2994, 68 L.Ed.2d 334 (1981) (Rehnquist, J., dissenting from denial of certiorari).[1]
The written requested charge is erroneous as a matter of Alabama law because it ignores the sentence reduction power of the trial judge, Beck v. State, 396 So.2d 645, 663 (Ala.1980), the sentence review power of the appellate courts, Beck, 396 So.2d at 664, and the commutation power of the governor, Ala. Const.1901, Amend. 38; Alabama Code Section 15-18-100 (1975).
A written requested charge should be refused if it is factually misleading or contains erroneous statements of law. Wilbanks v. State, 289 Ala. 171, 174, 266 So.2d 632 (1972); Yessick v. State, 274 Ala. 488, 491, 149 So.2d 818 (1962).
The supreme courts of Mississippi and Tennessee have held that it is not error for a trial court to refuse to give an instruction materially and substantially identical to the particular one requested here. Johnson v. State, 416 So.2d 383, 390-91 (Miss.1982); State v. Melson, 638 S.W.2d 342, 367 (Tenn. 1982). In Johnson, the Mississippi Supreme Court held that such an instruction was properly refused because it "was improper and was calculated to confuse the jury." 416 So.2d at 391. In Melson, the Tennessee Supreme Court noted that "this is not a full and fair reflection of what the jury was to consider; and dealt more with the effects of the verdict than the verdict itself." 638 S.W.2d at 367.

B
The trial judge acted properly in refusing to answer the jury's question concerning possible exceptions to life without parole. The appellate courts of this state have consistently held that it is improper for a trial judge to answer a juror's question about the pardon and parole laws. Lawley v. State, 264 Ala. 283, 87 So.2d 433 (1956); Robinson v. State, 335 So.2d 420, 423-25 (Ala.Cr.App.), cert. denied, 335 So.2d 426 (1976). "(T)he view of most of the courts which have considered the question (is) that it is prejudicial error for a court, trying a capital case to a jury, to comment or instruct upon the fact that in the event a prison term is imposed, the sentence may be reduced and the prisoner released before the expiration of the sentence, as a result of pardon or parole." Annot., 12 A.L.R.3d 832, 834 (1967). Neither the trial judge nor any party even hinted that life imprisonment without parole might not amount to life without parole. It would have been confusing and erroneous for the trial judge to have informed the jury about the possibility that an individual sentenced to life without parole might someday be released from prison. Such possibility is simply not for the jury's consideration. Lawley, 264 Ala. at 285, 87 So.2d 433.

IX
Our independent examination of the propriety of the death sentence in this particular case, as mandated by Beck v. State, 396 So.2d 645, 664 (Ala.1980), in accordance with the standards and procedures *848 approved in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), compels the conclusion that the defendant's death sentence is proper and is due to be upheld and affirmed.
The defendant was indicted and convicted of murder in the first degree for pecuniary gain or for other valuable consideration, which is a capital offense under the laws of this state. Alabama Code Section 13A-5-31(a)(7) (1975). Similar crimes throughout this state have been punished capitally.
The final sentence review inquiry mandated by Gregg and Beck, and the only one contested by the defendant, is whether the death sentence is appropriate for this particular defendant in light of the penalties imposed on his accomplices.
A thorough review of the evidence contained in the record convinces this Court that the death sentence is appropriate for this defendant and this crime. The facts are accurately summarized by the Attorney General:
"Just how appropriate the death sentence is for Appellant is established in his own voluntary statement about the crime and his culpability. Appellant was not trapped into the conspiracy, nor was he under the domination of co-defendant Walter `Red' Hunt. Instead, according to his own statement Appellant asked to be introduced to Hunt when he heard that Hunt was looking for someone to perform a murder for hire, and Appellant was the one who kept reactivating the plot after unsuccessful attempts, `when I needed money.' Over and over again, Appellant stalked Mr. Taylor, looking for a chance to murder him.
"It was Appellant who rejected a single-barrelled `regular shotgun' Hunt had obtained because it would give him only one shot, and Appellant who approved the sawed-off shotgun that became the murder weapon: `I said yes, that it was a lot better than the other one.' When the opportunity finally came, it was Appellant and no one else who shot Mr. Taylor twice in the head at close range with the shotgun. He would have shot the victim more, but as he explained: `the gun jammed and I didn't shoot it again.'
"In return for murdering a man whom he had never met, Appellant received a car and $200 `before the job was done' and $1500 `after the job was done.' Appellant's choice of words is significant. At no time during the months he was stalking his unsuspecting victim, choosing the murder weapon, planning the details, or carrying out the grisly homicide did it occur to Appellant that murdering an innocent man was anything other than `the job'. Clearly, the death sentence is appropriate for this defendant and this crime."
The question presented by the defendant is whether his sentence of death is disproportionate considering the crime and the defendant in light of the lesser sentences imposed on his co-conspirators in Mr. Taylor's death. These other participants are Walter "Red" Hunt, James Inzer, and Mrs. Susan Taylor.
In brief, the defendant characterizes Mrs. Taylor, the murder victim's wife, as "the person ultimately responsible" for her husband's death. The record reflects that law enforcement officials have not yet obtained sufficient evidence to charge Mrs. Taylor with any crime in connection with this case. Although her present whereabouts is unknown, the Jefferson County District Attorney's Office considers this case still open.
James Inzer, Mrs. Taylor's lover, was indicted for the same capital offense as the defendant. Alabama Code Section 13A-5-31(a)(7). In April of 1982, he was convicted by a jury of the lesser included non-capital offense of felony-murder (Section 13A-6-2(a)(3)). The trial judge sentenced him to life imprisonment.
"Red" Hunt was indicted and convicted for the same capital offense as the defendant in November of 1981. Section 13A-5-31(a)(7). However, a trial judge sentenced him to life imprisonment without parole. The defendant contends that Hunt was the *849 "lead figure" in the contract killing of Mr. Taylor.
While Beck, 396 So.2d at 664, obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in a crime receive the same punishment. "There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence. Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979). Each case is evaluated on its unique factual circumstance." McClesky v. State, 245 Ga. 108, 263 S.E.2d 146, 151, cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). See also Justus v. State, 247 Ga. 276, 276 S.E.2d 242, 245-46, cert. denied, 454 U.S. 882, 102 S.Ct. 366, 70 L.Ed.2d 193 (1981). Citing Lockett v. Ohio, 438 U.S. 586, 602-605, 98 S.Ct. 2954, 2963-65, 57 L.Ed.2d 973 (1978), the Supreme Court of South Carolina has held that while a number of "defendants are equally guilty of the crime of murder ..., they are not ipso facto deserving of the same punishment." State v. Shaw, 273 S.C. 194, 255 S.E.2d 799, 804, cert. denied, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979).
The one fact that the defendant was the "triggerman" is sufficient to distinguish him from the others for purposes of the death penalty. Shaw, 255 S.E.2d at 804. See also Justus, 276 S.E.2d at 245; McClesky, 263 S.E.2d at 151. The fact that the defendant was the actual perpetrator of the crime, the triggerman, is an important and very significant factor to weigh in determining whether the defendant's sentence to death is excessive or disproportionate to the penalty imposed in the cases of his co-defendants, Clark v. Commonwealth, 220 Va. 201, 257 S.E.2d 784, 792-96 (1979), cert. denied, 440 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 736 (1980), involving facts very similar to the facts of this case. We find valid reasons for the different punishments imposed on the defendant and the other co-conspirators and therefore find that the defendant's sentence is neither arbitrary nor capricious.
One of the fundamental principles of the decisions of the United States Supreme Court following Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), is that punishment should be tailored to fit each particular defendant and his personal culpability in the capital offense. Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 2940, 49 L.Ed.2d 859 (1976) ("The new Georgia sentencing procedures... focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant"). In Roberts v. Louisiana, 428 U.S. 325, 333, 96 S.Ct. 3001, 3006, 49 L.Ed.2d 974 (1976), the court noted that society has rejected the belief that "`every offense in a like legal category calls for an identical punishment without regard to the past life and habits of a particular offender.' Williams v. New York, 337 U.S. 241, 247 [69 S.Ct. 1079, 1083, 93 L.Ed. 1337] ... (1949)." Quoting from Furman, 408 U.S. at 402, 92 S.Ct. at 2810, the court recognized that "individual culpability is not always measured by the category of crime committed." The concept of "individualized sentencing" is generally recognized and "the definition of crimes generally has not been thought automatically to dictate what should be the proper penalty." Lockett v. Ohio, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). In Lockett, the court recognized the requirement "for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual." 438 U.S. at 605, 98 S.Ct. at 2965. In reversing the capital conviction of Earl Enmund because he "neither took life, attempted to take life, nor intended to take life", the Supreme Court noted: "The question before us is not the disproportionality of death as a penalty for murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on his culpability, not on that of those who committed the robbery and shot the victims, for we insist on `individualized consideration as a constitutional requirement in imposing the death sentence', Lockett v. Ohio, 438 U.S. 586, 605 [98 S.Ct. 2954, 2965, 57 L.Ed.2d 973] (1978) *850 ..., which means that we must focus on `relevant facets of the character and record of the individual offender.' Woodson v. North Carolina, 428 U.S. 280, 304 [96 S.Ct. 2978, 2991, 49 L.Ed.2d 944] (1976)." Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982) (emphasis in original).
We find that the defendant's sentence to death is neither excessive nor disproportionate, either with regard to the penalties imposed upon his co-conspirators or with regard to similar crimes throughout this state.
We have searched the entire record as required by A.R.A.P. 45A. We have found no error which has or probably has adversely affected the substantial rights of the defendant. The defendant's appointed counsel on both trial and appeal, the Honorable Orson L. Johnson, has represented the defendant with skill, diligence and attention. However, after a thorough review of the record, this Court is convinced that the defendant received a fair trial and was legally and properly convicted of the crime charged and sentenced to death within the provisions of the law.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.

ON REHEARING
BOWEN, Presiding Judge.
On Application for Rehearing, the defendant raises four additional arguments for reversing his conviction. He contends that each of the following constitutes plain error:

X
Venireman Lonnie Marbury was properly excused as a juror under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In response to questions by the trial court Marbury stated that he did not "believe a man should sentence another man to death" and that he could not return a verdict of death "regardless of how horrible the facts ... based on (his) belief against the death penalty." "As far as my thinking now, I would be (against the death penalty). That was my upbringing." Marbury's responses constitute a sufficient basis for the trial court's excusing the venireman because of his opposition to the death penalty. Ex parte Bracewell, 407 So.2d 845 (Ala.1979), reversed on other grounds, 407 So.2d 853 (Ala.1981); Liddell v. State, 287 Ala. 299, 251 So.2d 601 (1971).

XI
The defendant also argues for the first time that the trial court committed three errors in its oral instructions to the jury at the guilt-finding phase of the trial.

A
It is argued that the trial judge improperly commented on the defendant's failure to testify when he stated:
"There has been testimony of other people, other than this Defendant. This Defendant is on trial today. It is your duty to look to his guilt or his lack of guilt under the standard of reasonable doubt." (emphasis added)
Even under the more lenient standard of error in a capital case where the death penalty has been imposed, Gore v. State, 45 Ala.App. 146, 227 So.2d 432 (1969), we do not believe the above comment constitutes plain error or probably has adversely affected the defendant's substantial rights. A.R.A.P. 45A.

B
The defendant also contends that the trial court's charge on the lesser included offense of murder was inadequate and, in effect, excluded the jury's consideration of that offense. The allegedly objectionable portion of the oral charge is as follows:
"And if you are convinced beyond a reasonable doubt that he committed a murder in the first degree pursuant to a contract for hire as I have defined it to *851 you; that is, he was hired by someone for money to kill someone, it would be for pecuniary gain as a matter of law, and that would be a definition of a contract for hire. So, if you believe those elements, that is murder in the first degree pursuant to a contract for hire or for pecuniary gain, then it would be your duty to find the Defendant guilty of the capital offense as charged in the indictment, or as charged in Count One of the indictment.
"The lesser included offense of murder would be if you are convinced beyond a reasonable doubt that the Defendant committed murder in the first degree; that is the same elements, intentionally, maliciously, with premeditation and deliberation, but you have a reasonable doubt that it was done pursuant to a contract for hire or for pecuniary gain; if you have a reasonable doubt as to that element, then the verdict would be to find the Defendant guilty of murder as charged in the indictment."
We find no error in the charge.

C
The court's charge on the voluntariness of the defendant's confession was also proper although we do not recommend it as a model of clarity.
"There was evidence in this case, ladies and gentlemen, of an alleged confession. You determineyou may look to all the facts and surrounding circumstancesif you believe a confession was made in this case. You look to all the surrounding facts and circumstances; the circumstances under which it was taken, other facts and circumstances concerning that confession, to determine the credibility of it. In other words, you are the sole judges of the credibility of the confession. It's just a piece of evidence that came in, just like any other piece of evidence. You judge it, the credibility of it; you determine that. You may reject it as being unworthy of belief. You may accept it as being worthy of belief. But that is a fact which you take into consideration, a piece of evidence which you take into consideration as you would any piece of evidence into consideration. It is for you to judge the credibility of it; not the voluntariness of it, but the credibility of it; that is, if those words were stated, were they true and correct or were they untrue and incorrect, based on the totality of the circumstances."
The question of the admissibility of a confession addresses itself to the trial court while the credibility and weight to be given a confession are matters exclusively for the jury. Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976). Once the trial court has determined that a confession was freely and voluntarily given, it is for the jury to determine the probative effect it is to be given. Hall v. State, 365 So.2d 1249 (Ala.Crim.App.), cert. denied, Ex parte Hall, 365 So.2d 1253 (Ala.1978). "If the confession is held voluntary by the trial court and admitted in evidence, the jury shall consider all the facts and circumstances surrounding the taking of the confession in determining the weight of credibility which it will give the confession." Wallace v. State, 290 Ala. 201, 204, 275 So.2d 634 (1973).
In Clemmons v. State, 167 Ala. 20, 52 So. 467, 472 (1910), it was stated:
"The court, also as part of its oral charge, instructed the jury that the alleged confession of the accused was voluntary, provided they believed the evidence. This was likewise a charge upon the effect of the evidence and an invasion of the province of the jury."
The court's charge in this case is not subject to the defect found in Clemmons because of the following additional instruction given at the defendant's request:
"I charge you, ladies and gentlemen of the jury, that with regard to the alleged confession or statement of the Defendant, you may consider all of the facts and circumstances surrounding the taking of the alleged confession or statement in determining the weight or credibility, if any, which you give to the alleged confession or statement. In exercising your *852 exclusive prerogative of determining the credibility of the evidence or the weight to which the evidence is properly entitled, the jury shall consider circumstances under which the alleged confession was obtained and appliances by which it was supposedly elicited, including the situation and mutual relations of the parties. While the Court determines the voluntariness of the confession, the jury determines its weight or credibility and may disregard the alleged confession which is unworthy of belief or in which they entertain a reasonable doubt as to its worth."
After consideration of the new issues presented on application for rehearing and upon reconsideration of the issues raised on original submission, the judgment of the circuit court is affirmed and the application for rehearing is overruled.
OPINION EXTENDED; APPLICATION FOR REHEARING OVERRULED.
All Judges concur.
NOTES
[1] Since the decision of the United States Supreme Court in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), seven people have been executed. Gary Gilmore was executed by a Utah firing squad on January 17, 1977. John Spenkelink was electrocuted in Florida on May 25, 1979. Jesse Bishop was executed in Nevada's gas chamber on October 22, 1979. Steven Judy was electrocuted in Indiana on March 9, 1981. Frank Coppola was electrocuted in Virginia on August 10, 1982. Charles Brooks, Jr. was executed by lethal injection in Texas on December 7, 1982. John Louis Evans, III, was electrocuted in Alabama on April 22, 1983.