WELCH, Judge.
The State of Alabama appeals the circuit court’s order granting, in part, LaSamuel Lee Gamble’s postconviction petition attacking his capital-murder conviction and sentence of death.[1] Gamble filed a cross-appeal from the circuit court’s partial denial of claims in his postconviction petition.
In November 1998, Gamble was convicted of capital murder. The jury recommended, by a vote of 10 to 2, that Gamble be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Gamble to death. We affirmed Gamble’s capital-murder conviction but remanded the case to the circuit court for that court to consider the statutory mitigating circumstance that Gamble had no significant history of prior criminal activity and for that court to reweigh the aggravating and the mitigating circumstances. See Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000). On return to remand, we affirmed Gamble’s death sentence. See Gamble v. State, 791 So.2d at 449. The Alabama Supreme Court and the United States Supreme Court denied certiorari review. See Gamble v. State (No. 1992229, March 2, 2001), and Gamble v. Alabama, 534 U.S. 858, 122 S.Ct. 135, 151 L.Ed.2d 88 (2001).
In September 2002, Gamble filed a petition for postconviction relief pursuant to Rule 32, Ala. R.Crim. P., attacking his conviction and sentence. Gamble filed amended petitions in March 2003, November 2003, and November 2004. After an evidentiary hearing in June 2006, the circuit court issued a 131-page order finding that Gamble’s trial counsel had been ineffective at the penalty phase of Gamble’s trial because counsel did not investigate and present any mitigating evidence and that Gamble could no longer be sentenced to death because his more culpable code-fendant, Marcus Presley, had had his sentence commuted to life imprisonment without the possibility of parole because Presley was 16 years of age at the time of the murders. The State appealed the circuit court’s order granting, in part, Gamble’s Rule 32 petition. See Rule 4(b)(1), Ala. R.App. P., and Rule 32.10, Ala. R.Crim. P. Gamble also appealed from the circuit court’s order insofar as it denied a claim of ineffective assistance of counsel related to the penalty phase of his capital-murder trial.
The State’s evidence at Gamble’s capital-murder trial showed the following:
“On July 25, 1996, Gamble and his accomplices, Marcus Presley and Steven McKenzie,[2] robbed ‘John’s 280 Pawn,’ a pawnshop on Highway 280 in Shelby County. During the robbery, Presley *710 killed John Burleson, the owner of the pawnshop, and Janice Littleton, an employee of the pawnshop, by shooting them in the head. A surveillance camera inside the pawnshop captured the entire robbery on videotape, including Gamble’s participation in the robbery and the murders and Presley’s shooting of Burleson and Littleton.[3] Events depicted on the videotape revealed that approximately 30 minutes before the robbery, Presley entered the pawnshop, looked around, and asked Burleson about some merchandise in the store. Presley left, and at approximately 3:20 p.m., he returned, this time accompanied by Gamble (McKenzie did not come inside the pawnshop during the robbery, but waited outside in the car). Both men were armed with handguns. Gamble and Presley forced Burleson and Littleton to lie down on the floor behind the counter while they spent approximately 30 minutes going through the pawnshop, taking jewelry, guns, and cash from the cash register. Before leaving the store, Presley approached Burleson and Littleton, who were still lying on the floor; he leaned over the counter, and fired one shot. The videotape showed that after Presley fired the shot, his gun jammed. While he was trying to unjam his gun, Presley turned and motioned to Gamble, who was standing just outside the front door. Gamble walked to where Presley was standing, and then returned to the front door. Presley fired his gun at the victims a second time; his gun again jammed. At that point, Gamble began picking up unspent bullets that had fallen out of Presley’s gun when Presley was trying to unjam it. Presley fired one more shot at the victims. The videotape showed that Gamble then leaned over the counter and looked at the victims on the floor. The two men then quickly left the pawnshop.
“Testimony revealed that Presley shot Burleson twice in the head and Littleton once in the head. Burleson was dead when the police arrived at the pawnshop. Littleton was still alive when the police arrived, but she died later that day at the hospital from the gunshot wound.
“The day following the robbery-murders, Gamble and his accomplices traveled by bus to Boston, Massachusetts, where they remained for approximately one week. McKenzie was arrested in Boston on August 1, 1996. Information given to police by McKenzie led to the arrests of Gamble and Presley on August 9, 1996, in Norfolk, Virginia. Both Gamble and Presley gave statements to police officers in Virginia before they were returned to Alabama. On August 19, 1996, Gamble and Presley gave second statements to investigators with the Shelby County, Alabama, Sheriffs Office. Items identified as being stolen from the pawnshop were found in the possession of McKenzie, Gamble, and Presley after their arrests. Some of the items stolen from the pawnshop were also found in Gamble’s mother’s house in Birmingham.
Gamble, 791 So.2d at 415-16 (footnote omitted).

Standard of Review

“When reviewing a circuit court’s ruling on a Rule 32 petition, we apply an abuse-of-discretion standard. *711 Reed v. State, 748 So.2d 231 (Ala.Crim.App.1999). On direct appeal we reviewed the record for plain error; however, the plain-error standard of review does not apply to a Rule 32 proceeding attacking a death sentence. See Hill v. State, 695 So.2d 1223 (Ala.Crim.App.1997).”
Ferguson v. State, 13 So.3d 418, 424 (Ala.Crim.App.2008). However, “when the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001). The de novo standard gives no deference to the lower court’s findings. See Hooks v. State, 21 So.3d 772 (Ala.Crim.App.2008).
I.
The State argues that the circuit court erred in concluding that Gamble’s trial counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase of his capital-murder trial.
When evaluating claims of ineffective assistance of counsel, we use the standard articulated by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prove that counsel was ineffective, the petitioner must show that: (1) counsel’s performance was ineffective; and (2) he was prejudiced by the ineffective performance.
“Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ See Michel v. Louisiana, [350 U.S. 91], at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.”
Strickland v. Washington, 466 U.S. at 689.
“[T]he purpose of ineffectiveness review is not to grade counsel’s performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [ (1984) ]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’ Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or “what is prudent *712 or appropriate, but only what is constitutionally compelled.’ Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).”
Chandler v. United States, 218 F.3d 1305, 1318-19 (11th Cir.2000) (footnotes omitted).
In regard to an attorney’s duty to investigate, we have stated:
“While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, ‘this duty only requires a reasonable investigation.’ Singleton v. Thigpen, 847 F.2d 668, 669 (11th Cir.(Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 822, 102 L.Ed.2d 812 (1989) (emphasis added). See Strickland, 466 U.S. at 691, 104 S.Ct. at 2066; Morrison v. State, 551 So.2d 435 (Ala.Cr.App.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990). Counsel’s obligation is to conduct a ‘substantial investigation into each of the plausible lines of defense.’ Strickland, 466 U.S. at 681, 104 S.Ct. at 2061 (emphasis added). ‘A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made.’ Id., 466 U.S. at 686,104 S.Ct. at 2063.”
Jones v. State, 753 So.2d 1174, 1191 (Ala.Crim.App.1999).
More recently, the United State Supreme Court in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), addressed a claim that counsel was ineffective for failing to adequately investigate and present mitigation evidence. The Wiggins Court found that counsel’s performance was ineffective because counsel failed to investigate and present evidence that Wiggins had a dysfunctional and bleak upbringing, that he suffered from substantial physical and sexual abuse, and that he had mental deficiencies. The Court stated:
“Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant’s moral culpability. Penry v. Lynaugh, 492 U.S. 302, 319 (1989) (‘“[EJvidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse” ’); see also Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (noting that consideration of the offender’s life history is a ‘ “part of the process of inflicting the penalty of death” ’); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (invalidating Ohio law that did not permit consideration of aspects of a defendant’s background).”
539 U.S. at 535,123 S.Ct. 2527. The Court further stated:
“In finding that [trial counsel’s] investigation did not meet Strickland’s performance standards, we emphasize that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the ‘constitutionally protected independence of counsel’ at the heart of Strickland, 466 U.S., at 689. We base our conclusion on the much more limited principle that ‘strategic choices made after less than complete investigation are reasonable’ only to the extent that ‘reasonable professional judgments support the limitations on investigation.’ Id., at 690-691. A decision not to investigate thus ‘must be directly assessed for rea *713 sonableness in all the circumstances.’ Id., at 691.
“Counsel’s investigation into Wiggins’ background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records — evidence that would have led a reasonably competent attorney to investigate further.”
539 U.S. at 533-34.
In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court found that counsel’s performance was deficient because counsel did not begin to investigate mitigation evidence until a week before trial and counsel “failed to conduct an investigation that would have uncovered extensive records graphically describing Williams’ nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records.” 529 U.S. at 395.
“The United States Court of Appeals for the Eleventh Circuit has held that trial counsel’s failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991) (‘our case law rejects the notion that a “strategic” decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them’), cert. denied, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); see, also, Jackson v. Herring, 42 F.3d 1350, 1366-68 (11th Cir.) (‘Although counsel need not “investigate every evidentiary lead,” he must gather enough knowledge of the potential mitigation evidence to arrive at an “informed judgment” in making [the decision not to present such evidence].... [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.’) (emphasis added; citations omitted), cert, dismissed, 515 U.S. 1189, 116 S.Ct. 38,132 L.Ed.2d 919 (1995).”
Ex parte Land, 775 So.2d 847, 853-54 (Ala.2000). In Jackson v. Herring, 42 F.3d 1350 (11th Cir.1995), the United States Court of Appeals for the Eleventh Circuit stated:
“In cases where sentencing counsel did not conduct enough investigation to formulate an accurate life profile of a defendant, we have held the representation beneath professionally competent standards. See, e.g., Blanco [v. Singletary], 943 F.2d [1477] 1501-03 [(11th Cir.1991) ] (counsel’s performance deficient where his sole attempt to procure mitigation witnesses for penalty phase was to leave messages for the witnesses and await their responses, and he thus ultimately conducted no interviews); Harris [v. Dugger], 874 F.2d [756] 763 [ (11th Cir.1989) ] (counsel deficient where he did not investigate defendant’s family, scholastic, military and employment background); Middleton [v. Dugger], 849 F.2d [491] 493 [(11th Cir.1988) ] (performance deficient where ‘trial counsel conducted almost no background investigation, despite discussions with Middleton concerning the existence of such mitigating evidence’ as psychiatric problems, brutal childhood, physical, sexual and drug abuse, and low I.Q.); Armstrong [v. Dugger], 833 F.2d [1430] 1433-34 [ (11th Cir.1987) ] (performance deficient where trial counsel’s investigation of mitigating evidence was limited to single conversation with defendant *714 and his parents, and another conversation with defendant’s parole officer).”
42 F.3d at 1367.
With these principles in mind, we review the circuit court’s detailed findings in regard to this claim. The circuit court made the following findings of fact:
“This Court makes the following findings of fact as to what each counsel did, and failed to do, at Gamble’s capital murder trial in regards to investigating and presenting mitigating evidence for the jury’s consideration. As to Mr. Harry Lyon, this Court finds that Gamble’s case was the first case in which Mr. Lyon participated in the penalty phase of a capital trial. This Court finds, based on Mr. Lyon’s own admissions, that prior to Gamble’s case, he did not know what mitigation evidence was, how to obtain mitigating evidence, or what mitigating evidence was admissible during the penalty phase of a capital trial. This Court finds that Mr. Lyon failed to visit or see his client at the local jail prior to trial and that the extent of his interactions with his client were confined to meetings in the courtroom during various pretrial hearings, this Court finds that Mr. Lyon did not meet any family members or friends of the Gamble family until the trial had started. This Court finds that Mr. Lyon’s statement that he and co-counsel ‘worked on the whole case as a team,’ to be inaccurate. This Court finds that Mr. Lyon took almost no role in the investigation of mitigating evidence: Mr. Lyon made no effort to contact family members; Mr. Lyon made no effort to contact friends; Mr. Lyon made no effort to contact former teachers; and Mr. Lyon made no effort to obtain any records pertaining to Gamble or his family.
“To the extent that Mr. Lyon billed the State of Alabama for 61 hours of out-of-court preparation for mitigation, this Court finds that not one billed hour reflected factual investigation into potential mitigating evidence. This Court notes that the first entry regarding preparation for mitigation occurs less than two months before Gamble’s trial. Except for watching the trial of Presley, Gamble’s co-defendant who was tried first, Mr. Lyon billed almost exclusively for ‘legal research’ and ‘preparation for mitigation trial.’ Mr. Lyon’s billing entries entitled ‘preparation for mitigation,’ however, simply reflect additional legal research with intermittent phone calls to cocounsel and learning what ‘aggravating things,’ the State intended to introduce at Gamble’s capital-murder trial. This Court also finds that the majority of hours billed by Mr. Lyon in ‘preparation for mitigation’ occurred the same month as Gamble’s capital murder trial — indeed, twenty hours are billed as ‘Preparation for Mitigation Trial’ a mere two days before trial started. None of the hours submitted by Mr. Lyon were part of an active investigation to obtain mitigating evidence.
“This Court finds that Mr. Lyon’s failures with regard to obtaining and presenting mitigating evidence were, in part, due to an unreasonable misunderstanding of the scope of mitigating evidence. Mr. Lyon reached the conclusion that, before any mitigating evidence was admissible at the penalty phase, it must fit within one of the statutorily-enumerated mitigating circumstances outlined at § 13A-5-51[, Ala.Code 1975]. The Court reaches this conclusion based on many factors. First, Mr. Lyon testified at the Rule 32 evidentiary hearing that it was ‘my understanding of the law,’ that any potential mitigating evidence had to fit within one of the statutorily defined circumstances outlined by the Legislature. Second, Mr. Lyon’s closing *715 argument to the jury in the penalty phase consisted of simply reading and commenting on each statutorily-listed mitigating circumstance, whether it applied to Gamble and his case or not. And, third, Mr. Lyon explained at the Rule 32 evidentiary hearing that there was no basis to hire a mitigation specialist in Gamble’s case ‘because there were no mitigating factors to present other than the two statutory mitigating factors that I argued at trial.’ This Court finds that not only did Mr. Lyon fail to contribute to an investigation of possible mitigating evidence, but his conclusions about what constituted mitigation, were, as a matter of law, in error.
“This Court finds that Mr. Morgan first attempted contact with the family of Gamble in February 1997, when he sent letters to Gamble’s parents. As admitted by Mr. Morgan, at the time he sent these letters he was unaware of the mental/emotional status of either parent, their cognitive limitations, or their alcohol and drug abuse. This Court finds that the next substantial step to locate Gamble’s family was not undertaken by Mr. Morgan until November 1997, a mere eleven days before the start of the trial. This Court further finds that Mr. Morgan’s attempt to gather mitigating information consisted of randomly stopping people in Gamble’s neighborhood and asking these people if they knew Gamble, and, if so, what was their opinion of him. Mr. Morgan had no basis to believe that any of the people he stopped and talked to actually knew Gamble or could provide reliable information. This Court finds that the efforts by counsel to contact the members of Gamble’s family were minimal. This Court further finds that the methods chosen to locate Gamble’s family were ill-conceived and highly unlikely to produce positive results. This Court also finds that ‘in-the-field’ attempts to talk to Gamble’s family did not occur until the last minute — at a time where any information provided by the family could not be corroborated or verified through the accumulation of documentary evidence.
“This Court finds that Mr. Morgan had clear notice that Gamble had some level of cognitive limitation. Despite this knowledge, this Court finds that counsel failed to follow this lead, instead choosing to submit Gamble to a competency and legal insanity assessment. Counsel testified that he hoped that Gamble’s evaluation would be the ‘one in a thousand tests where the psychiatrist that does the test would say, uh huh, this guy is mentally ill.’ Counsel chose not to talk to any of Gamble’s teachers who provided valuable testimony at the Rule 32 evidentiary hearing, chose not to obtain any educational records which likewise proved to be valuable evidence at the hearing, and chose not to submit Gamble to cognitive testing which, when undertaken by post-conviction counsel, conclusively demonstrated that Gamble was cognitively limited.
“This Court finds that counsel failed to request any of the multitude of records concerning Gamble and his family that were readily available. Counsel concedes, and this Court finds, that counsel failed to procure Gamble’s medical records, educational records, family records, such as DHR [Department of Human Resources] records, social service or welfare records, and juvenile dependency or family court records.
“This Court agrees with Mr. Morgan that for these failures there was ‘no excuse.’ This Court finds that counsel failed to investigate or make further inquiries regarding Gamble’s father, Leo *716 Gamble, Jr. This Court finds that counsel had knowledge of Leo Gamble’s military service in Vietnam, his subsequent violence, erratic behavior, and drug and alcohol dependencies. This Court finds, as counsel conceded, that counsel could not have judged the value of pursuing mitigation evidence concerning his client’s father having never seen any of the existing records or documentation.
“Mr. Morgan recognized the need to hire a mitigation specialist or mitigation investigator in Gamble’s case. This Court finds that Gamble’s trial counsel actually filed a motion seeking funds for a mitigation investigator, but abandoned that request. Mr. Morgan concedes that a mitigation specialist could have obtained the necessary records that counsel failed to seek, could have located the family, could have talked to teachers, and could have testified on behalf of family members incapable of testifying in a courtroom. Mr. Morgan concedes that a mitigation expert should have been hired in Gamble’s case. This Court finds that there was no legitimate reason not to seek the services of a mitigation specialist, and that the failure to do so did not rest on any tactical or strategic basis.
“This Court finds that Mr. Morgan did not meet with members of Gamble’s family until November 17, 1997, ‘right before the trial started.’ This Court finds that Mr. Morgan made an initial assessment to call some of Gamble’s family members as witnesses, but made this assessment after speaking with them, in a group, for approximately ten minutes. This Court further finds that, at this last minute, Mr. Morgan had no idea what he wanted the family members to testify about because no mitigation investigation had been conducted. This Court finds that the ultimate decision not to call any witnesses to testify at the penalty phase of Gamble’s trial was not a strategic or tactical decision, as suggested by the State, but, in counsel’s own words, ‘we just didn’t have enough information because we didn’t get a mitigation specialist.’ At one point in Mr. Morgan’s testimony, he commented that he had ‘the impression that sometimes it was possible that mitigation hurt the case, that they would have been better off without it.’ Perhaps such a case exists. Any such ‘impression’ or ‘decision’ about the merits of presenting mitigating evidence or not can only be made after a reasonable investigation into mitigation, and in the absence of a reasonable mitigation investigation, such decisions cannot reasonably be made by counsel.
“Having made the foregoing findings of fact, this Court applies the relevant law to these facts to determine if the performance of Gamble’s trial counsel was constitutionally deficient. This Court recognizes that federal courts of appeals have analyzed counsel’s performance in a case, including cases prior to the publication of the 1989 ABA Guidelines for counsel in capital cases, by citing both the 1989 and 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. See e.g., Dickerson v. Bagley, 453 F.3d 690 (6th Cir.2006); Hamblin v. Mitchell, 354 F.3d 482 (6th Cir.2003). They do so under the theory that the 1989 and 2003 ABA Guidelines are ‘not aspirational in the sense that they represent norms newly discovered after Strickland.’ but are instead simply ‘the clearest exposition of counsel’s duties at the penalty phase of a capital case,’ Hamblin, supra, 354 F.3d at 487, 488. These duties are rooted in Strickland as well as longstanding, commonsense principles of representation under *717 stood by competent counsel in death-penalty cases. Notably, in Rompilla v. Beard, 545 U.S. 374 (2005), the United States Supreme Court seemed to adopt this approach, and applied the 1989 and 2003 ABA Guidelines as the guiding rules and standards to a case whose trial occurred before the publication of the 1989 ABA Guidelines![2]] This Court need not resolve such weighty questions; Gamble was tried in November 1997. The 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases were in existence at the time of Gamble’s trial. Therefore, this Court will use the 1989 ABA Guidelines, and forego the 2003 ABA Guidelines, to assist it in resolving the question whether Gamble’s trial counsel’s performance met prevailing professional norms.
“Guideline 11.4.1 of the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases is entitled ‘Investigation.’ The Guideline reads: ‘Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel’s entry into the case and should be pursued expeditiously.’ ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 11.4.1(A) (1989) (hereinafter ABA Guidelines or Guideline). With respect to investigation in preparation for the sentencing phase, Guideline 11.4.1(C) states, ‘This investigation should comprise efforts to discover all reasonably mitigating evidence!)]’ This did not occur in Gamble’s case.
“The same guideline suggests sources of investigative information:
“ ‘collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior); special educational needs (including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to em-ployability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution, education or training, and clinical services); religious and cultural influences.
“ABA Guideline 11.4.1(D)(2)(C). None of this information was sought, except through counsel’s request that his client, who presented obvious cognitive deficits, compose a journal that would include his biography. Neither attorney sought medical records, educational records, military records, family records or social history records.
“This Court finds that not one of the ABA Guidelines concerning the investigation into mitigating evidence was adopted by Gamble’s counsel. There was no mitigation plan, an inconsequential mitigation investigation, no mitigation investigator or specialist, and no *718 mitigating evidence presented at the sentencing phase. On this evidence alone, this Court finds trial counsel deficient. This Court garners support for its conclusion by considering decisions of the United States Supreme Court and the Eleventh Circuit Court of Appeals.
“As the United States Supreme Court repeatedly emphasized in Wiggins v. Smith, 589 U.S. 510 (2003), the question of whether counsel exercised ‘reasonable professional judgment’ is not answered by whether counsel should have presented a mitigation case. Rather, the focus is whether the underlying investigation supporting counsel’s decision not to introduce mitigating evidence was itself reasonable. Wiggins, supra, 589 U.S. at .522-23. In Wiggins, as in Gamble’s case, counsel did not present evidence in mitigation. But the Supreme Court’s decision rested on an assessment of counsel’s mitigation investigation. Counsel in Wiggins had their client evaluated. by a psychologist, who concluded that petitioner had a low IQ, had difficulty coping with demanding situations, and had features of a personality disorder. Wiggins, supra, 539 U.S. at 523. Gamble’s counsel did not have their client evaluated, except for a two-day examination for competency, which Gamble’s own counsel described as a ‘farce.’ In Wiggins, petitioner’s counsel also ‘tracked down’ records from the Department of Social Services documenting their client’s various foster care placements, as well as a pre-sentence investigation report, that noted petitioner’s ‘misery as a youth,’ his own self-reported background as ‘disgusting,’ and his long-term placement in foster care. Wiggins, supra, 539 U.S. at 523. Gamble’s counsel did not ‘track down’ any records concerning Gamble or his family, even though they had direct knowledge of Gamble’s cognitive limitations and knowledge of his father’s violence and alcohol and drug abuse. The United States Supreme Court, in Wiggins, found that counsel fell short of professional standards by not expanding their investigation beyond the records they obtained. Wiggins, supra, 539 U.S. at 524. Gamble’s counsel did not obtain a single record and never had their client evaluated for cognitive limitations. If counsel was deficient in Wiggins, counsel for Gamble, having done even less, must likewise be deficient
“In Brownlee v. Haley, 306 F.3d 1043 (11th Cir.2002), the Court of Appeals for the Eleventh Circuit found that trial counsel had ‘failed to conduct any kind of substantive investigation into his background or character for purposes of presenting potentially mitigating evidence at sentencing.’ Brownlee, supra, 306 F.3d at 1068. Indeed, the State of Alabama conceded that counsel’s performance was deficient, Brownlee, supra, 306 F.3d at 1068-69, and this Court finds no relevant distinction between the performance of counsel in Brownlee and that of Gamble’s trial attorneys.
“In another case from the Court of Appeals for the Eleventh Circuit, Hardwick v. Crosby, 320 F.3d 1127 (11th Cir.2003), the attorney ‘did not obtain social service and juvenile records that showed that Hardwick’s father was an abusive alcoholic’ and did not obtain records that show that ‘Hardwick was found to possess dirty syringes,’ at age 14. Hard-wick, supra, 320 F.3d at 1173-74. In addition, during state post-conviction proceedings, Hardwick demonstrated the existence of clear mitigating evidence not located by counsel, including the fact that ‘there was a story of heavy alcoholism on both sides of his family, mother and father, especially on the father’s side, with ... his father being an *719 alcoholic’ Hardwick, supra, 320 F.3d at 1174. In addition, ‘there was a history of physical abuse shown ... by his father toward his mother ... there was a history that there was a lack of parenting support or structure by either parent in the opinion of other relatives.’ Hardwick, supra, 320 F.3d at 1174. The mitigating evidence present in Gamble’s case is remarkably similar to that in Hardwick. In both cases, the attorneys failed to conduct a reasonable mitigation investigation, and in both cases, voluminous evidence of mitigation evidence— that was available had counsel only conducted a reasonable investigation — was presented at the state post-conviction evidentiary hearing.
“Many other cases rendered by the Court of Appeals for the Eleventh Circuit support Gamble’s contention that his trial counsel were deficient in failing to conduct a reasonable mitigation investigations. See e.g.. Jackson v. Herring, 42 F.3d 1350 (11th Cir.1995); Cave v. Singletary, 971 F.2d 1513 (11th Cir.1992); Cunningham, v. Zant, 928 F.2d 1006 (11th Cir.1991); Thomas v. Kemp, 796 F.2d 1322 (11th Cir.1986); Blake v. Kemp, 758 F.2d 523 (11th Cir.1985). After considering case law from the United States Supreme Court and the Court of Appeals for the Eleventh Circuit, and consideration of the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the only possible conclusion is that trial counsel, in failing to conduct a reasonable mitigation investigation, failed to exercise reasonable professional judgment and fell far short of meeting the prevailing norms of practice.”
(C.R. 1590-1602.)
In Gamble’s case, counsel presented no mitigation evidence at the penalty phase of his trial — no witnesses were called to testify in his behalf. At the postconviction proceedings, Gamble presented the testimony of his mother, his aunt, his uncle, his cousin, two of his sixth-grade teachers, and a friend. His family members painted a bleak picture of Gamble’s childhood.
Lois Gamble, Gamble’s mother, testified that her husband and Gamble’s father, Leo Gamble, was abusive and violent, that he beat her when he was drunk, and that he drank often. She said that she had been in special education when she was in school because she was “slow.” Lois testified that she had three children — LaSamuel, Mary Alice, and Loneka — but that Loneka had been smothered to death when she was one month old when Leo arrived home drunk and passed out on top of Loneka. Cassandra Dunn, Gamble’s maternal aunt, testified that Gamble’s home was a very violent environment and that Lois and her children lived with Leo’s mother in a “run down shack.” The house was filthy, she said, and you could see through the floor boards. Dunn also testified concerning Lois’s mental problems growing up and her difficulty reading. She detailed one occasion when Lois had taken Gamble and his sister to live in Atlanta. Dunn testified that she received a telephone call that Lois had abandoned her children. Her older sister, she said, went to Atlanta to bring the children back to Birmingham, but Lois did not return with them. Sometime later, Dunn said, Lois returned to Birmingham and Lois, Gamble, and his sister moved in with a friend of Lois’s. Lenair Gamble, Gamble’s paternal uncle, testified that his brother was not a good father because he was never around, that he had a drinking problem, and that both of Gamble’s parents were alcoholics. Lolita Wilson, one of Gamble’s sixth-grade teachers, said that Gamble was “academically slow” and received special help with reading. Robbie May, one of Gamble’s sixth-grade teachers, *720 testified that Gamble was in a remedial program for special-needs children. Fernando Green, Gamble’s cousin, testified that Gamble’s father was an alcoholic and that they lived in a rundown shack with 14 other people. Marvin Holiday, a friend, testified to the appalling conditions of the house in which Gamble lived in, a house described as a “crack house.”
Gamble introduced numerous exhibits in support of his claims of ineffective assistance of counsel.[3] The school records for Gamble’s mother showed that when she was 14 years of age she had a full-scale IQ of 56 and was considered to be “educable mentally retarded.” Leo Gamble’s school records showed that he had an IQ of 72 in the 11th grade. Social Security Administration records showed that Leo had been tested when he applied for benefits and that he had an organic mental disorder because of his “heavy alcohol consumption” and was possibly schizophrenic. Department of Human Resources (“DHR”) records showed that when Gamble was three months old he was hospitalized. The records show that Gamble was “dirty and emaciated.” At that time Child Protective Services obtained custody of Gamble because of parental neglect. Seven months later Lois regained custody. DHR records also show that Gamble, until he was 7 years of age, lived in his paternal grandmother’s home, a “run down shack,” with 23 relatives in 4 rooms. In 1984, when Gamble was seven, he moved to Atlanta with his mother and attended four different schools in two years. In 1986, Gamble and his mother returned to Birmingham. For the next year, Gamble and his sister were passed around among their relatives. In 1987, Gamble and his mother moved in with a friend and lived with her for nine years. The friend sold drugs out of her house and frequently had Gamble assist her in her drug sales. The testimony and exhibits presented a bleak and troubled childhood marked by neglect and indifference.
Gamble’s school records showed that he frequently missed classes, that he made mostly “Ds” and “Fs,” that he attended fourth grade three times, and that he was only promoted to the fifth grade based on the school’s policy of “social promotion.” Gamble was 15 years of age in the 7th grade and dropped out of school in the middle of that school year. Gamble was administered the Stanford-Binet Intelligence Scale in 2004 and it was determined that he had a full-scale IQ of 82 — which placed him in the low-average range. The State’s expert at the Rule 32 proceedings, Dr. Glen King, a clinical psychologist, testified that he administered IQ tests to Gamble and that his full-scale IQ was 77. None of the above evidence was presented as mitigation at Gamble’s capital-murder trial.
Gamble’s two trial attorneys — Harry Lyon and Joe Morgan, Jr. — testified at the postconviction evidentiary hearing. Morgan testified that he was responsible for investigating mitigating evidence for the penalty phase of Gamble’s trial. He met with Gamble one time to discuss mitigating evidence, and he began to prepare mitigation evidence about two months before trial.[4] Morgan said that he wrote to Gamble’s mother several times and attempted *721 to reach Gamble’s relatives by telephone, but was unsuccessful. Also, he said that 11 days before trial he realized that Gamble’s relatives would not communicate with him, so he went to Gamble’s neighborhood. He walked around the neighborhood, he said, and he asked anyone he could find about Gamble. Morgan testified that he did not attempt to obtain Gamble’s school records, family medical records, family DHR records, or Gamble’s juvenile records. Neither did Morgan attempt to obtain the services of a mitigation expert.[5] Morgan knew that Gamble had mental deficiencies based on the pretrial tests conducted at Taylor Hardin Secure Medical Facility. Lyon testified that he believed that before mitigating evidence could be presented it had to fit within one of the statutorily defined mitigating circumstances.
Judge Michael Joiner, the same judge who presided over Gamble’s penalty phase at trial, found that the failure to present the omitted mitigating evidence resulted in prejudice to Gamble. When sentencing Gamble to death, the circuit court found one aggravating circumstance — that the murder was committed while Gamble was engaged in the commission of a robbery. As mitigating circumstances, the circuit court found that Gamble had no significant history or prior criminal activity and that he was 18⅜ years old at the time of the offense. As nonstatutory mitigating circumstances, the court found:
“(1) Gamble’s age and maturity; (2) the involvement of drugs in Gamble’s life and the effect the drugs may have had in diminishing Gamble’s capacity to understand and appreciate his actions; (3) the fact that Gamble was not the trig-german in the offense; (4) the relative culpability of the codefendant, who was the triggerman; and (5) Gamble’s cooperation in providing complete statements with regard to the fact and circumstances of this case and other cases he had knowledge of.”
Gamble, 791 So.2d at 450 (opinion on return to remand). Because the same judge who presided over Gamble’s trial found that the failure to present the mitigating evidence resulted in prejudice to Gamble, we afford this finding considerable weight. See Francis v. State, 529 So.2d 670, 673 n. 9 (Fla.1988) (“Postconviction relief motions are not abstract exercises to be conducted in a vacuum, and this finding is entitled to considerable weight.”).
This is not a case in which the omitted mitigating evidence was cumulative to evidence that was presented, see Ferguson v. State, 13 So.3d 418 (Ala.Crim.App.2008), or in which counsel investigated and made an informed strategic decision not to present evidence concerning Gamble’s upbringing, see Waldrop v. State, 987 So.2d 1186 (Ala.Crim.App.2007). Here, counsel’s investigation was so inadequate that they failed to discover any mitigation evidence to present at the penalty phase — although the Rule 32 evidentiary hearing clearly showed that there was a plethora of evidence that could have been presented on Gamble’s behalf.
We agree with the circuit court; Gamble was denied the effective assistance of counsel at the penalty phase of his capital-murder trial because counsel failed to investigate and present mitigating evidence.[6] *722 See Strickland v. Washington. The circuit court correctly granted relief on this claim.
II.
The State next argues that the Rule 32 court erred in granting Gamble relief on his claim that his death sentence is arbitrary, capricious, and disproportionate to the penalty imposed on his more culpable codefendant and the triggerman, Marcus Presley. Presley’s sentence of death was vacated, and he was sentenced to life imprisonment without the possibility of parole based on the Supreme Court’s decision in Roper v. Simmons, 540 U.S. 1160, 124 S.Ct. 1171, 157 L.Ed.2d 1204 (2004), which barred a sentence of death for a defendant who was sixteen years of age at the time he or she committed murder.
The circuit court stated the following when granting relief on this claim:
“Gamble asserts that because his clearly more culpable co-defendant, Marcus Presley, cannot receive a death sentence, Gamble’s death sentence is rendered arbitrary, capricious, and disproportionate. Petitioner claims that to execute him, when he did not kill either of the two victims in this case while the undisputed triggerman is spared, constitutes ‘cruel and unusual punishment’ and violates constitutional mandates of fundamental fairness. On June 6, 2006, this Court granted Gamble’s request to amend his Rule 32 Petition. Subsequently this court received evidence and heard testimony concerning this claim, including the testimony of District Attorney Robert Owens, who personally prosecuted both Presley and Gamble, and who continues to serve as the elected District Attorney of Shelby County, Alabama.
“For the purposes of this claim, Gamble is challenging the constitutionality of his sentence in the present day, post[Roper v.] Simmons [, 540 U.S. 1160 (2004) ]. Specifically, as pled, it is the re-sentencing of Presley to a non-death sentence that makes Gamble’s sentence of death constitutionally unfair. Buttressing Petitioner’s claim of fundamental unfairness is the testimony of District Attorney Robert Owens at the Rule 32 evidentiary hearing.
“Mr. Owens was called to the witness stand by counsel for Petitioner Gamble. Since his election in 1993, Mr. Owens has continuously held the position of District Attorney for Shelby County, Alabama. As District Attorney for Shelby County, he has personally tried approximately ten capital cases to conclusion. The ultimate decision to seek the death penalty rests with him. In making the decision to seek the death penalty in any one case, Mr. Owens testified that he considers the facts of the particular case, as well as issues of fairness and equity.
“Mr. Owens made plain-that had the United States Supreme Court’s decision in Roper v. Simmons not rendered Presley’s sentence of death unconstitutional, he would not be testifying on behalf of Petitioner. It was, however, this District Attorney’s continued commitment to issues of fairness and equity that compelled his current testimony before this Court.
“The Court finds it instructive that Mr. Owens, in his testimony, mentioned at least two separate factors that influenced his evaluation of fairness and equity in this case. Mr. Owens emphasized not only the backgrounds of these individuals, but the differing conduct at the occurrence of the event. The Court concurs that there is a substantial difference in both the background of these *723 individuals and in the conduct of these two individuals at the occurrence of the event.
“After considering the testimony and evidence presented by Petitioner, this Court concurs with the opinion of the District Attorney — that in this particular case, it would be fundamentally unfair to continue to seek the death of Gamble while Presley’s sentence has now been commuted to life without the possibility of parole.
“It is the responsibility and duty of each court that sits in judgment of the constitutional validity of Gamble’s sentence to ensure that the imposition of the death penalty comports with the requirements of fundamental fairness while avoiding arbitrariness. Proportionality in sentencing between co-defendants is a major, independent element under the Eighth Amendment in assessing a death sentence. See Enmund v. Florida, 458 U.S. 782, 788 (1982). In determining whether a death sentence is proportionate, and therefore, not arbitrary, the Supreme Court directs reviewing courts to not only evaluate the defendant’s culpability individually, but also relative to his co-defendants and accomplices in the same case. Enmund v. Florida, 458 U.S. 782, 788, 798 (1982). In Enmund, supra, the United States Supreme Court confronted the scenario where co-defendants, who had ‘plainly different’ levels of culpability for the killings, all received the same sentence of death. The Court found that, among co-defendants, sentencing alike those who had different degrees of responsibility ran afoul of the Eighth and Fourteenth Amendments. Enmund, supra. 458 U.S. at 798. Gamble’s case presents an even more egregious situation, where the defendant with the unquestionably greater culpability received the lesser sentence. See, e.g., People v. Kliner, 705 N.E.2d 850, 897 (Ill.1998) (‘[Similarly situated codefendants should not be given arbitrarily or unreasonably disparate sentences.’); Larzelere v. State, 676 So.2d 394, 406 (Fla.1996) (‘When a code-fendant ... is equally as culpable or more culpable than the defendant, disparate treatment of the codefendant may render the defendant’s punishment disproportionate.’). Whether the issue is that of ‘plainly different’ defendants receiving the same sentence of death, or that of similarly-eulpable defendants receiving different sentences, the inquiry remains the same: whether the sentences are arbitrarily or unreasonably disparate.
“In numerous cases, Alabama appellate courts have adjudicated the constitutionality of death sentences by comparing the sentences received by co-defendants. See e.g., Ex Parte Henderson, 616 So.2d 348 (Ala.1992) (reconsideration of death sentence in light of fact that sentence imposed in companion case was remitted from death by electrocution to life in prison without benefit of parole); Ex parte Burgess, 811 So.2d 617 (Ala.2000) (reconsideration of death sentence where five of six co-equal participants in a crime received immunity from prosecution, and sixth received death sentence); Ex parte McWhorter, 781 So.2d 330 (Ala.2000) (affirming sentence of death for defendant and lesser sentences for accomplices because of defendant’s pivotal role as ‘trigger-man’ in crime); Gavin v. State, 891 So.2d 907 (Ala.Crim.App.2003) (affirming death sentence of triggerman when accomplices were not sentenced to death); Hamm v. State, 564 So.2d 453 (Ala.Crim.App.1989) (‘The evidence in *724 the instant case established that appellant was the “triggerman,” and this point alone is sufficient to justify the disparity in the sentences.’); Williams v. State, 461 So.2d 834 (Ala.Crim.App.1983), rev’d on other grounds, Ex parte Williams, 461 So.2d 852 (Ala.1984) (‘The fact that the defendant was the actual perpetrator of the crime, the triggerman, is an important and very significant factor to weigh in determining whether the defendant’s sentence to death is excessive or disproportionate to the penalty imposed in the cases of his codefendants.’).
“This Court finds that although Gamble and Presley share criminal liability, Presley bears the greater culpability for the tragic murders of John Burleson and Janice Littleton. Faced with the ‘bizarre’ result that the more culpable Presley no longer faces execution, while the lesser culpable Gamble remains on death row, this Court finds such a result to be arbitrary, disproportionate, and fundamentally unfair. This Court concludes that such inequity must be remedied, and accordingly orders that Gamble’s sentence of death be vacated. A sentencing hearing shall be scheduled after this order becomes final and at that time Gamble shall be resentenced to a sentence other than death in accordance with the dictates of the Eighth and Fourteenth Amendments to the United States Constitution.”
(C.R. 1638-49.)
The State argues that the circuit court erred in finding that Gamble’s death sentence was automatically rendered disproportionate when his 16 year-old codefen-dant’s death sentence was reduced to life without the possibility of parole. It asserts that the court’s finding conflicts with longstanding precedent that provides that a defendant convicted of capital murder is entitled to an individualized sentencing determination. The State relies on Getsy v. Mitchell, 495 F.3d 295 (6th Cir.2007); Farina v. State, 937 So.2d 612 (Fla.2006); and Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), to support its argument.
The United States Court of Appeals for the Sixth Circuit in Getsy v. Mitchell, 495 F.3d 295 (6th Cir.2007), reviewed whether Gets/s death sentence was arbitrary and disproportionate given that his codefen-dant, who was sentenced by a different jury, was sentenced to life imprisonment. The court stated:
“Eighth Amendment proportionality, as defined by the Supreme Court, refers ‘to an abstract evaluation of the appropriateness of a sentence for a particular crime.’ Pulley v. Harris, 465 U.S. 37, 42-43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) (holding that the petitioner was not constitutionally entitled to a proportionality review that would ‘compare Harris’s sentence with the sentences imposed in similar capital cases’). Proportionality as defined by the Supreme Court evaluates a particular defendant’s culpability for his crime in relation to the punishment that he has received. See, e.g., Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (reversing the death sentence of a mentally retarded defendant); Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (reversing the death sentence of a defendant who did not himself take life, attempt to take life, or intend to take life); Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (reversing the death sentence of a defendant for the rape of an adult woman that did not result in her death). In each of these cases, the Supreme Court struck down a death sentence not because it was disproportionate in com *725 parison to sentences received by other, similarly situated defendants, but because of what the Court deemed to be the inappropriateness of the sentence in relation to the particular characteristics of the crime and the criminal at issue. These cases are of no help to Getsy, a competent adult who personally and intentionally committed aggravated murder.
“Unlike this absolute or individualized proportionality, Getsy’s proportionality argument rests on a claim that his death sentence is disproportionate only by comparison to Santine’s [his codefen-dant’s] life sentence. In Pulley, the Supreme Court considered the precise argument asserted by Getsy — that the Constitution demands a comparative proportionality review that ‘purports to inquire ... whether the penalty is ... unacceptable in a particular case because [it is] disproportionate to the punishment imposed on others convicted of the same crime.’ Pulley, 465 U.S. at 44, 104 S.Ct. 871. The Court squarely rejected this argument as contrary to its holdings in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). Pulley, 465 U.S. at 50-51, 104 S.Ct. 871. Three years later, the Court reaffirmed Pulley’s, holding in McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). In that case, the Court expressly held that a defendant could not ‘prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the death penalty.’ McCleskey, 481 U.S. at 306-07,107 S.Ct. 1756 (emphasis in original).”
495 F.3d at 305-06.
The Florida Supreme Court in Farina v. State, 937 So.2d 612 (Fla.2006), addressed the validity of the trial court’s reduction of Farina’s sentence based on the fact that his codefendant, who had been sentenced two years after Farina was sentenced, had been sentenced to life imprisonment. The court stated:
“Although Jeffrey’s life sentence would normally constitute newly discovered evidence under Scott [v. Dugger, 604 So.2d 465 (Fla.1992) ], we reduced his sentence because he was not eligible as a matter of law to receive the death penalty. See Farina [v. State ], 801 So.2d [44,] 56 [ (Fla.2001) ] (citing Brennan [v. State ], 754 So.2d [1,] 5-6 [ (Fla.1999) ]). Thus, as we stated in Anthony’s direct appeal, Jeffrey’s life sentence ‘is irrelevant to Anthony’s proportionality review because the aggravation and mitigation in their cases are per se incomparable.’ Id. Jeffrey’s life sentence would not ‘probably result in a life sentence for [Anthony] on retrial.’ See Ventura [v. State ], 794 So.2d [553,] 571 [ (Fla.2001) ].”
937 So.2d at 618. See Williams v. State, 793 N.E.2d 1019, 1023 (Ind.2003) (“That Rouster’s death sentence has been vacated because Rouster is mentally retarded has no bearing on the lawfulness of the sentence Williams received. Williams is entitled to and has received an individualized sentencing determination.”). See also Annot., Appellate Review of Sentences, 39 Geo.L.J. Ann. Rev.Crim. Proc. 906 n. 2710 (2010) (“A sentence is not disproportionate under the Eighth Amendment just because it exceeds a codefendant’s sentence.”).
This Court in Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991), stated:
“In Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982), the Court held that the death penalty is unconstitutional for one *726 who ‘does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed.’ In Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), the Court held that it was not cruel and unusual punishment to impose the death penalty upon a defendant who played a significant role in the felony that resulted in murder and who acted with reckless indifference to human life. The rule that has evolved from Enmund and Tison is that the death sentence is disproportionate under the Eighth Amendment for the non-triggerman who was not present at the scene and did not intend that anyone be killed; however, it is permissible under the Eighth Amendment for felony murderers who actually killed, attempted to kill, or intended that a killing take place or that lethal force be used. In White v. Wainwright, 809 F.2d 1478, 1484 (11th Cir.1987), in holding that the death penalty may be imposed for conviction of a joint robbery undertaking where the defendant contemplated that lethal force would be used, even though he claims personal opposition to the use of lethal force, the court stated:
“ ‘In Ross v. Kemp, 756 F.2d 1483 (11th Cir.1985) (en banc) we considered the possibility that appellant was a non-shooter and that the fatal shot was fired by his accomplice. We declined to read Enmund in a mechanistic fashion but merely “as requiring a level of individual participation that justifies the application of the death penalty,” id. at 1489, and we concluded that the primary purposes of capital punishment, deterrence and retribution, legitimately could be applied to the facts of the case. Id. We found, in the language of Enmund, that the defendant’s “intentions, expectations and actions” rose to a level of culpability that the retributive purposes of capital punishment would be furthered by defendant’s sentence. Id. And, in reaching these holdings, we considered not only the contemplation of lethal force but also the active participation by the defendant in the activities that culminated in the victim’s death. Id.’ ”
603 So.2d at 386-87.
Alabama recognizes that capital-murder codefendants have a right to an individualized sentencing determination and do not have to be sentenced to the same punishment. “To determine the appropriate sentence, the sentencer must engage in a ‘broad inquiry into all relevant mitigating evidence to allow an individualized determination.’ ” Ex parte Smith, [Ms. 1010267, March 14, 2003] — So.3d—, —(Ala.2003), quoting Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). As the Alabama Supreme Court stated in Ex parte McWhorter, 781 So.2d 330 (Ala.2000):
“The law does not require that each person involved in a crime receive the same sentence. Wright v. State, 494 So.2d 726, 739 (Ala.Crim.App.1985) (quoting Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970)). Appellate courts should ‘examine the penalty imposed upon the defendant in relation to that imposed upon his accomplices, if any.’ Beck v. State, 396 So.2d 645, 664 (Ala.1980). However, the sentences received by codefendants are not controlling per se, Hamm v. State, 564 So.2d 453, 464 (Ala.Crim.App.1989), and this Court has not required or directed that every person implicated in a crime receive the same punishment. Williams v. State, 461 So.2d 834, 849 (Ala.Crim.App.1983), rev’d on other grounds, 461 So.2d 852 (Ala.1984). ‘ “There is not a simplistic rule that a co-defendant may not be sentenced to *727 death when another co-defendant receives a lesser sentence.” ’ Id. (quoting Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979)).”
781 So.2d at 344. The issue whether code-fendants should be sentenced to the same punishment based on Alabama’s proportionality review was addressed by the Alabama Supreme Court in Ex parte Thomas, 460 So.2d 216 (Ala.1984). The Court stated:
“The sentences received by co-defendants must be considered by this court in determining the appropriateness of a death sentence on appeal, Beck v. State, 396 So.2d [645] 664 [ (Ala.1980) ], but they are not controlling per se. (Appellant’s contention that the trial court should have expressly considered the sentences received by appellant’s co-defendants is answered in Coulter v. State, 438 So.2d 336 (Ala.Cr.App.1982), aff'd, 438 So.2d 352 (Ala.1983)). In that case, we affirmed the Court of Criminal Appeals holding the disproportionality question involving consideration of co-defendant sentences is something to be addressed by the appellate courts instead of at the trial level. Accord, Miller v. Florida, 459 U.S. 1158, 103 S.Ct. 802, 74 L.Ed.2d 1005 (1983) (Marshall, J., dissenting from denial of certiorari).1[7]1 Were they [sic], there would be no need for us to make the other inquiries we mandated in Beck.”
460 So.2d at 226-27. In Coulter v. State, 438 So.2d 336 (Ala.Crim.App.1982), we stated: “In the sentencing phase of the trial, the fact that an alleged accomplice did not receive the death penalty is no more relevant as a mitigating factor for the defendant than the fact that an alleged accomplice did receive the death penalty would be as an aggravating circumstance against him.” 438 So.2d at 345. See Ex parte Tomlin, 909 So.2d 283 (Ala.2003), citing Coulter, 438 So.2d at 345: “[Tomlin’s codefendant’s] sentence cannot properly be used to undermine a mitigating circumstance.” Compare Ex parte Burgess, 811 So.2d 617 (Ala.2000) (Supreme Court directed trial court to consider fact that Burgess was the only one of six participants in the murder who was prosecuted for the offense).
First, we question whether the issue of the proportionality of Gamble’s sentence to that of his codefendant’s was properly before the Rule 32 court given that the Supreme Court in Thomas held that a proportionality review is conducted by an appellate court and not a trial court. See § 13A-5-53, Ala.Code 1975. Section 13A-5-53(b), Ala.Code 1975, states that the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme *728 Court, shall determine: “(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.”
Second, in Alabama a defendant convicted of capital murder is entitled to an individualized sentencing determination. “What is important ... is an individualized determination on the basis of the character of the individual and the circumstances of the crime.” Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). “‘Because of “the need for individualized consideration as a constitutional requirement in imposing the death sentence,” Lockett v. Ohio, 438 U.S. 586, 605 (1978), the focus must be on the defendant.’ ” Gavin v. State, 891 So.2d 907, 994 (Ala.Crim.App.2003), quoting Wright v. State, 494 So.2d 726, 740 (Ala.Crim.App.1985). Here, the circuit court, when setting aside Gamble’s death penalty, based its decision on the fact that his codefen-dant was sentenced to life imprisonment. As the Florida Supreme Court stated in Farina:
“The reason [the codefendant] did not receive the death penalty, however, had nothing to do with the circumstances of the crime or the presence or absence of aggravating or mitigating factors. The basis was purely legal: we had held in Brennan [v. State ], 754 So.2d [1] at 1 [ (Fla.1999) ], that the imposition of a sentence of death on a sixteen-year-old defendant constitutes cruel and unusual punishment, and Jeffrey was sixteen years old at the time of these murders. See Farina [v. State ], 763 So.2d [302] at 303 [ (Fla.1999) ] (citing Brennan, 754 So.2d at 5-6). Thus, whereas in Scott [v. Dugger, 604 So.2d 465 (Fla.1992) ], a jury analyzed the facts and, considering the aggravating and mitigating circumstances, recommended a sentence of life, in this case, despite a jury recommendation of a sentence of death, and the trial court’s imposition of such a sentence, this Court concluded as a matter of law that Jeffery was ineligible for the death penalty. See id. Unlike Scott, Jeffrey’s sentence reduction has no connection to the nature or circumstances of the crime or to the defendant’s character or record. Under Lockett [v. Ohio ], [438 U.S. 586 (1978),] it is irrelevant as a mitigating circumstance in Anthony’s case.”
937 So.2d at 620.
Third, Gamble presented this claim to the circuit court in a motion to amend his petition to allege a “newly-cognizable constitutional claim” that his death sentence was now disproportionate given that his codefendant’s death sentence had been vacated based on Roper v. Simmons, supra.[8] However, there is no constitutional right to a proportionality review in death-penalty cases. As the United States Supreme Court stated in Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984): “comparative proportionality review is not constitutionally required in every state court death sentence review.... In fact, the United States Supreme Court has specifically rejected the claim that a capital defendant can prove an Eighth Amendment violation ‘by demonstrating that other defendants who may be similarly situated did not receive the death penalty.’ ” 465 U.S. at 43. In Alabama, § 13A-5-53(b)(3), Ala.Code 1975, provides that a proportionality review be conducted by the appellate court on every death sentence; *729 however, this statute does not apply to the circuit court.
For the reasons stated above, we hold that the circuit court erred in finding that Gamble’s death sentence was due to be vacated because it was constitutionally disproportionate and excessive to his codefen-dant’s sentence of life imprisonment without the possibility of parole.
Accordingly, for the reasons stated in Part I of this opinion, we affirm the circuit court’s judgment granting Rule 32 relief in part; for the reasons set out in Part II, we reverse the circuit court’s judgment insofar as it holds that Gamble cannot be sentenced to death merely because his co-defendant was sentenced to life imprisonment without the possibility of parole, and we remand this case to the Shelby Circuit Court for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
WISE, P.J., and WINDOM, KELLUM, and MAIN, JJ., concur.

. Rule 32.10, Ala. R.Crim. P., states: “Any party may appeal the decision of a circuit court according to the procedures of the Alabama Rules of Appellate Procedure to the Court of Criminal Appeals upon taking a timely appeal as provided in Rule 4, Alabama Rules of Appellate Procedure.”

"2The record shows that McKenzie, who waited outside of the pawnshop in the car during the robbery and murders, pleaded guilty, pursuant to a plea agreement with the State, to two counts of murder.

"3There was no audio on the videotape.”

. “Although the ABA guidelines may, in some instances, provide guidance as to what is reasonable in terms of counsel’s representation, they are not determinative. Rather, the two-pronged analysis set forth in Strickland remains the standard for deciding ineffective-assistance-of-counsel claims.” Jones v. State, 43 So.3d 1258, 1278 (Ala.Crim.App.2007).

. Dr. Elizabeth Beck, who had been retained to conduct a psychosocial assessment on Gamble, also testified to the majority of the facts contained in the numerous exhibits. She testified that she conducted 21 interviews with Gamble’s family members and teachers and that she obtained numerous records relating to Gamble’s childhood.

. Morgan's fee declaration showed that he spent only 2.7 hours talking with Gamble about possible mitigating evidence to present at the penalty phase.

. A motion for a mitigation expert was filed but was abandoned by trial counsel.

. Because we have affirmed the circuit court’s order granting relief on Gamble’s claim that his counsel was ineffective at the penalty phase for failing to investigate and present mitigation evidence, it is unnecessary to review Gamble’s claim in his cross-appeal that his counsel erred in failing to object to the circuit court’s instructions in the penalty phase.

. In Miller v. Florida, 459 U.S. 1158, 103 S.Ct. 802, 74 L.Ed.2d 1005 (1983), Justice Marshall stated the following in his dissent from the denial of certiorari review:
"An appellate court, in the performance of the viewing function which this Court has held indispensable to a constitutionally acceptable capital punishment scheme, must examine the sentences imposed in all capital cases in the jurisdiction in order 'to ensure that similar results are reached in similar cases.’ Proffitt v. Florida, 428 U.S. 242 (1976) (opinion of Stewart, Powell and Stevens, JJ.). See also, e.g., Godfrey v. Georgia, 446 U.S. 420 (1980) (plurality). The sentencer has a different role. The sentencer's duty is to determine the first instance whether a death sentence is warranted for a particular defendant. That determination can only be made on the basis of the evidence that the judge has heard with respect to that defendant, and, under the Florida procedure, on the recommendation made by the juiy that heard that evidence. A capital sentencing determination cannot properly be made on the basis of evidence presented in another trial or a recommendation made by another jury.”
459 U.S. at 1161.

. In Ex parte Pierce, 851 So.2d 606, 616 (Ala.2000), the Alabama Supreme Court recognized that, to survive the procedural bars of Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P., a petitioner's constitutional claim must allege that the evidence was not known or could not reasonably have been discovered in time to raise the issue at trial or on appeal.